Woodrow FERGUSON et al., Respondents,

v.

UNION ELECTRIC COMPANY OF MIS-
SOURI, a corporation, Appellant.

No. 44482.

Supreme Court of Missouri.

Division No. 1.

Sept. 12, 1955.

Motion for Rehearing or to Transfer to
Court En Banc Denied Oct. 10, 1955.

Harry H. Kay, Eldon, H. C. Salveter, Sedalia, for appellant, John A. Woodbridge, St. Louis, of counsel.

George H. Miller, Sedalia, Frank M. Brady, Warsaw, Ralph B. Nevins, Hermitage, for respondents.

COIL, Commissioner.

Union Electric Company of Missouri has appealed from a judgment for damages allegedly sustained by respondents as a result of floodwaters overflowing their respective farms. We shall refer to the parties as they were designated in the trial court. Originally there were nine counts in plaintiffs' second amended petition involving seven different farms. Prior to the submission of the case two of the counts were dismissed. The $38,671.90 judgment entered was for damages to crops on five farms and included seven separate claims. Defendant contends, inter alia, that the trial court erred in giving instruction 2.

Defendant owns and operates a hydro-electric dam at Bagnell, Missouri, which impounds the waters of the Osage River and its tributaries to form the Lake of the Ozarks. The dam is about 2,560 feet long and 148 feet in height. In it there are twelve floodgates, each 24 feet x 32 feet. Those gates at full capacity will permit a total of 144,000 cubic feet of water per second to pass through them when the lake is normally full, i.e., 660 feet above mean sea level. In addition, there are six openings in the dam which permit water to pass to generators for the purpose of producing power, each of which, at full capacity and a normal full lake level, will allow 5,000 cubic feet of water per second to pass through. The total Osage watershed is an area of 14,000 square miles; 11,500 square miles of which are above Warsaw, Missouri. Warsaw is 95 miles (by water) above the dam.

According to plaintiffs, when the water level is 660 feet above sea level at the dam, the lake reservoir covers 60,000 acres and extends from the dam 125 miles by water to the County Line Bridge which spans the Osage between St. Clair and Henry Counties. Two of plaintiffs' farms are located on the Osage, one on Hogles Creek, and two on the Pomme de Terre River, both of which latter streams are Osage tributaries, and all five farms are located between the County Line Bridge and Warsaw.

Plaintiffs alleged in their petition that in June and July of 1951 floodwaters of the Lake of the Ozarks overflowed and "backed upon the farm land of plaintiffs, remaining upon said land for several days, and damaging and destroying plaintiffs' crops".

Defendant had obtained easements giving it the right to flood plaintiffs' farms to certain heights (varying as to the individual plaintiffs between 667 and 673 feet). In each instance, however, plaintiffs sought recovery only for crop damage occurring above the height designated in the respective easements. (Overflow or flooding of plaintiffs' farms and crops will hereinafter refer to overflow or flooding above the easement level.)

Plaintiffs' basic theory was that the height of the water at the dam affected the height of the water in the Osage at any place in the lake reservoir, and consequently at any place below the County Line Bridge, and that the height of the water at the dam likewise affected the height of the water in the two Osage tributaries involved, the Pomme de Terre River and Hogles Creek, for a distance from their respective mouths beyond the location of plaintiffs' three farms on those tributaries. Plaintiffs adduced evidence to the effect that if the lake level at the dam had been maintained at a height not in excess of 660 feet above sea level, all the Osage floodwaters would have flowed past plaintiffs' respective farms

without overflowing; that the lake level was not maintained at 660 feet above sea level or less, although defendant could have so maintained it by proper use of the floodgates, but, on the contrary, the lake level at the dam was permitted to be and remain higher than 660 feet.

Defendant's basic theory was that in flood times the height of the water at the dam had no effect whatever on the height of the water on plaintiffs' farms for the reason that the farms are located so far away from the dam that they could not be influenced by the lake; that had defendant completely drained the lake prior to the 1951 flood, such act would have made no difference so far as concerned the overflow of plaintiffs' farms, because they were located on a section of the Osage and at places on Osage tributaries where those streams flowed as natural streams, and that "the water that passes these farms don't know there is a lake ahead of it," and that all of the involved farms were flooded by an "Osage River headwaters rise."

In short, plaintiffs contended that the height of the lake affected the height of the water on plaintiffs' farms during flood times, and that defendant caused the overflow and the damage by permitting the lake to get too high at the dam; while defendant contended that in flood times such as June and July of 1951 the height of the lake had no effect on the height of the water on plaintiffs' farms and consequently it did not matter how high the lake was at the dam or how the floodgates were operated, or whether they were opened at all or to any particular extent.

Plaintiffs' instruction 2 was: "The Court instructs the jury that if you find and believe from the evidence that in the months of June and July, 1951, the defendant Union Electric Company, owned and operated a hydro-electric dam across the Osage River at Bagnell, Missouri, and if you further find that said dam impounded the waters of the Osage River, creating a reservoir which at full stage of 660 feet above mean sea level extended from Bagnell, Missouri, to approximately the county line between Henry and St. Clair Counties; and if you further find that plaintiffs' farms in question were either upon or nearby the said reservoir as it extended above Warsaw, Missouri; and if you further find and believe that in addition to passage ways for the impounded water to reach the electrical generating turbines there were 12 flood gates in said dam for the purpose of allowing flood water coming into said reservoir to pass said dam; and if you find and believe that said floodgates were of such number, size and capacity to allow all of the flood waters which would have flowed by plaintiffs' farms in June and July, 1951, to pass said farms and thence through said dam without causing the overflow and destruction of the crops in question on plaintiffs' farms; and if you further find and believe that plaintiffs' crops in question, and for which they ask damages from the defendant were flooded and destroyed in the latter part of June and the early part of July, 1951; and if you further find that said flood or overflow waters were caused to go upon plaintiffs' lands because of the failure of the defendant to open the flood gates sufficiently at said dam; and if you further find and believe that in failing to open the flood gates sufficiently at the dam to allow said flood water to pass without destroying plaintiffs' crops that defendant failed to use ordinary care and was negligent; and if you further find and believe that said negligence, if any, was the direct and proximate cause of the destruction of each and all of plaintiffs' crops in question, then your verdict will be against the defendant and in favor of the plaintiffs."

Defendant contends that the instruction was erroneous in that it omitted an essential element of plaintiffs' case, viz., a finding "that defendant knew, or by the exercise of reasonable diligence should have known, that sufficient flood waters would flow past plaintiffs' farms in June and July, 1951, to cause plaintiffs' farms to be flooded and their crops damaged unless it opened its gates and that it knew, or should have known such fact in time for it to prevent such overflow and damage to plaintiffs by opening its gates at the Dam."

We think that contention must be sustained. The duty of defendant to exercise care to so operate its dam as not to injure plaintiffs was not violated and thus defendant was not negligent, unless the jury found that defendant possessed, or as a reasonably prudent operator of a hydroelectric dam should have possessed, timely knowledge concerning the effect of 1951 floodwaters on plaintiffs' farms, and that the overflow could have been prevented by timely sufficient opening of the floodgates. Otherwise stated, the jury, to find defendant failed to exercise the requisite care in failing to sufficiently open the floodgates, had to find that the degree to which the gates were opened was not sufficient and that the defendant, in the exercise of care, so knew or so could have known in time to have opened the floodgates sufficiently and thereby have prevented the overflow.

The instruction required the jury to find in effect that defendant had the gates available; that it failed to open them sufficiently; that the failure to so open the gates sufficiently proximately caused the overflow of plaintiffs' farms and the destruction of their crops; and that such failure to open the gates sufficiently was negligence. The trouble with the instruction is that it directed the jury to find plaintiff negligent upon the sole essential finding of causal connection between failure to open the floodgates and the overflow of plaintiffs' farms. It omitted any requirement that the jury find that defendant had or should have had prior timely knowledge necessarily prerequisite to the further finding that defendant's failure to have opened the floodgates sufficiently was negligence. We cannot know from an examination of this instruction whether the jury considered and contemplated in its finding that defendant's failure to sufficiently open the gates was negligence, the question of the prior timely knowledge of defendant. We do know, however, that the instruction is so drawn that we may not say that the jury must have found prior timely knowledge in order to have found negligence as submitted in the instruction.

Cases, such as Trzecki v. St. Louis Public Service Co., Mo., 258 S.W.2d 676, 680, wherein an instruction submitting particular facts was so drawn that it could be confidently said that "the duty of defendant to exercise care to select a reasonably safe place for plaintiff, a passenger, to alight contemplated the duty of exercising care to ascertain whether the place where defendant discharged its passengers was reasonably safe." The instruction in that case was attacked because it omitted a requirement for a finding that defendant's motorman knew or saw or, by the exercise of the highest degree of care, should have known or seen a hole into which plaintiff stepped. We held that the jury's finding that the street by reason of the hole was not reasonably safe, and that defendant was guilty of negligence in failing to select a reasonably safe place to discharge plaintiff-passenger, and the requirement for a finding of proximate causation "implicitly required the jury's consideration and finding that defendant's operator saw or, by taking appropriate precautions in selecting a reasonably safe place for plaintiff to alight, should have seen the hole into which plaintiff stepped." See also Kilo v. Howe, Mo., 257 S.W.2d 640, 642, as another example of a case wherein it was held that the jury could not have found the facts hypothesized without including therein a finding not specifically hypothesized, and which it was contended had been erroneously omitted.

Then there are cases wherein lack of notice to an employer is involved where, because the defect hypothesized is of such nature that a finding that it existed could not be made without an implicit finding that defendant had knowledge of its prior existence, we have held that the omission of a requirement for a specific finding of prior knowledge is not prejudicially erroneous. For a discussion of that line of cases and for the reason for an opposite result in the cited case, see Hatfield v. Thompson, Mo., 252 S.W.2d 534, 543.

We do not mean to say that the cases mentioned are precisely in point or neces-

sarily controlling in the circumstances of the instant case. We mention them to illustrate the general proposition that unless we may say that instant instruction 2 required findings of fact which necessarily included a finding of defendant's prior timely knowledge, the instruction was prejudicially erroneous.

■ Plaintiffs contend, however, that the fact of defendant's necessary prior timely knowledge was conceded at the trial. Plaintiffs cite cases which correctly hold that it is not reversible error for an instruction to assume or omit a conceded fact. The trouble with this contention is that, while, as plaintiffs contend, defendant's testimony was to the effect that it continuously studied rainfall in the Osage watershed and estimated the amount of prospective waters which would flow into the lake at given times, defendant did not concede that any knowledge it had or could have had would have or should have put it on notice that failure to open the gates more than it did open them would cause plaintiffs' farms to be overflowed and plaintiffs' crops damaged. And defendant did not concede or admit that any available knowledge could or should have been acquired in time to have caused it to have opened the gates wider prior to the date when plaintiffs' damage was accomplished, viz., by July 2, 1951.

■ It is true, as heretofore noted, that defendant contended that the height of the lake did not and could not affect the height of the water on plaintiffs' farms during flood times and that, therefore, it did not and could not have mattered how high the lake was or how wide the floodgates were opened. Now, if plaintiffs, as part of or to aid their case, were entitled to the benefit of defendant's testimony supporting its fundamental defense theory, then it is apparent that from plaintiffs' standpoint defendant's evidence would have eliminated any controverted issue as to its prior timely knowledge. But it appears that defendant's theory and the evidence supporting it were completely at war with and contrary to plaintiffs' fundamental recovery theory, viz., that the height of the water at

the dam did affect the height of the water on plaintiffs' farms. Consequently plaintiffs could not, as part of their case, use defendant's evidence or defensive theory. Fisher v. Gunn, Mo., 270 S.W.2d 869, 873, 874. So that even though, under defendant's theory, prior timely knowledge was unimportant, still, under plaintiffs' directly contrary theory upon which plaintiffs must have recovered, it was an essential element of plaintiffs' case.

Plaintiffs further contend, however, that their pleading, evidence, and submission were such as to justify a recovery of damages for trespass irrespective of whether their pleading, proof, and submission also justified a recovery based upon a finding of specific negligence; that, therefore, the pleading and required finding of negligence should be treated as surplusage in that such constituted the assumption by plaintiffs of an unnecessary burden. Defendant answers that plaintiffs are bound by the theory upon which their case was submitted in the trial court and that we should not review a case upon a different theory than that upon which it was submitted below. Nance v. Atchison, T. & S. F. Ry. Co., 360 Mo. 980, 986, 232 S.W.2d 547, 551; Davis v. Chicago & E. I. R. Co., 338 Mo. 1248, 94 S.W.2d 370; Frye v. Baskin, Mo.App., 231 S.W.2d 630, 633, 635 [9].

There is no doubt that the allegations of plaintiffs' second amended petition, upon which the case was tried, were sufficient to, and in fact did, state a claim for recovery of damages for trespass. As we shall point out, however, we think is equally clear that plaintiffs' petition also proceeded independently of and apart from trespass, for recovery of damages based upon allegations of defendant's specific negligence. Plaintiffs alleged, in effect, that defendant owned, maintained, and operated a dam across a natural watercourse which impounded, held back, and retarded the natural flow of the Osage and its tributaries, which caused the water of the Osage and its tributaries to overflow adjacent lands and form the Lake of the Ozarks; that defendant's dam contained floodgates to regulate and control

the water level within the lake; and that in June and July of 1951 floodwaters from the lake overflowed plaintiffs' lands and damaged plaintiffs' crops.

Plaintiffs further alleged, in separately-numbered paragraph 7, that the "maintenance and operation of said Bagnell Dam" slowed the natural flowage of waters of the Osage and its tributaries which caused the beds of the Osage and its tributaries to fill, thus decreasing their water-carrying capacities so that in flood times their waters did not flow at a normal rate or in normal quantities, "thereby contributing to cause the said flood water to back up and overflow the lands of the plaintiffs; and that said overflow and resulting damages would not have occurred except for the presence, maintenance and operation of said dam."

In paragraph 8, plaintiffs alleged that defendant's lake acted as a retarding agent upon the drainage of overflow waters of the Osage and its tributaries, thereby decreasing their natural carrying capacities, "and thereby contributing to cause the overflow of plaintiffs' land and contributing to cause said flood waters to remain upon said plaintiffs' land for a considerable period of time and damaging the plaintiffs as hereinafter set out."

Paragraph 9 was: "Plaintiffs further state that the negligence and carelessness of the defendant in failing to open sufficient flood gates prior to and during flood stage, and in negligently and carelessly allowing the water level of said Lake to be unnecessarily and unreasonably high at these particular times of the year, and under all the facts and circumstances there attending was a further direct, proximate and contributing cause to the overflow and damage of the plaintiffs' crops as hereinafter set out."

Paragraph 10 was in part: "Plaintiffs further state that because of the combined acts aforesaid on the part of the defendant, plaintiffs were damaged as follows: * *."

As we view it, paragraphs 7 and 8 of plaintiffs' petition clearly alleged facts, proof of which would support a recovery for damages for trespass irrespective of defendant's negligence. Kennedy v. Union Electric Co. of Missouri, 358 Mo. 504, 510, 216 S.W.2d 756, 757. In the Kennedy case this court specifically pointed out that there was no contention there that the dam was negligently operated during the 1943 flood there involved, but that "Plaintiffs' action is tort in the nature of trespass, on the theory that impounding waters by the dam caused great silt deposits in the Osage River and its tributaries at the head of the lake, raising the beds of the streams, retarding their flow and resulting in an overflow high enough to flood plaintiffs' building."

Paragraph 9 of instant plaintiffs' petition just as clearly alleged and their proof put in issue defendant's negligent operation of the floodgates prior to and during the 1951 flood. Plaintiffs adduced evidence to support the allegations contained in all the paragraphs 7, 8, and 9. They chose, however, to submit to the jury only the issue which arose by reason of the allegations of paragraph 9, viz., the negligent operation of the floodgates, and they chose to submit such as the proximate cause of the overflow and their damage.

Under those circumstances we are of the opinion that plaintiffs effectively took the position that, while the fact of the *presence of the dam* across a natural watercourse and the consequent lake had the effect of tending to make the water level in the vicinity of plaintiffs' farms higher than it would have been if there had been no dam or lake, nevertheless, the proximate cause of this particular 1951 overflow and their resulting damages was not the *presence of the dam and lake* as such, and not its maintenance and operation (operation in the sense of generally operating), but, rather, was the result of defendant's negligence in failing to open the floodgates sufficiently, i.e., negligently operating in a specified detail. In other words, plaintiffs voluntarily and apparently as a result of choice-consciousness took the position and proceeded on the theory that the *dam* and the conse-

quent *lake* did not and would not have caused any overflow of their lands were it not for the negligent failure of defendant to have sufficiently opened the floodgates. Even if it may be said that because the gates were an integral part of the dam it was, therefore, in final analysis, the presence of the dam that caused the overflow, still the fact remains that, according to plaintiffs, the act which caused the trespass was negligent operation, not the mere damming of a natural watercourse. Plaintiff alleged, sought to prove, and submitted that the act or omission which caused the trespass (the water overflowing plaintiffs' farms) was the negligent failure of defendant to open the floodgates sufficiently wide.

■■ It is our view that plaintiffs' allegations and evidence were such that they could have submitted their case either on trespass or negligence or on both trespass and negligence. See Curtis v. Fruin-Colnon Contracting Co., 363 Mo. 676, 681, 253 S.W. 2d 158, 161 [2–4]. Under the circumstances that they chose to eliminate their trespass theory of recovery and to proceed solely on their duly-pleaded negligence theory, we may not determine the validity of instruction 2 except as it is considered an instruction submitting specific negligence.

■ Plaintiffs cited cases to support their theory that the allegation of negligence in the petition and the submission of negligence in the instruction should be treated as surplusage are not applicable to the facts before us. Most of them apply the well-established rule that where a petition states facts not necessary to a recovery, plaintiff need not prove those unnecessary allegations. One of plaintiffs' cited cases, Scalpino v. Smith, 154 Mo.App. 524, 135 S.W. 1000, does tend to support plaintiffs' present contention. While we think the case is distinguishable, we shall not analyze it herein because we are not persuaded that anything stated in Scalpino should change our conclusion in the instant case.

■ Point II in defendant's brief is that "The Court Erred in Giving Instruction No. 2 at the Request of the Plaintiffs * * *." As subpoint C under point II, defendant says that: "The plaintiffs did not make a submissible case of negligence as there was no substantial evidence upon which a verdict could stand." The transcript shows that defendant filed no motion for directed verdict at the close of plaintiffs' case or at the close of all the evidence, and that it filed no after-trial motion to set aside plaintiffs' verdict and judgment and enter judgment for defendant. Defendant's motion for new trial asked only that the trial court grant it a *new trial* for the reason that "there is no substantial evidence to support the verdict." In its brief defendant seeks an outright reversal for plaintiffs' alleged failure to make a submissible case on negligence. If we assume, without deciding, that we should, in view of the record, nevertheless examine defendant's contention that plaintiffs failed to make a submissible case on negligence, it would be an unavailing procedure, because we are of the opinion that, under all the circumstances, plaintiffs should not be precluded from a retrial of the issues in the light of this opinion. Our disposition of the case makes it also unnecessary to review defendant's other contention that the trial court erred in failing to declare a mistrial because of the alleged disqualification of a juror.

For the reason that instruction 2 was prejudicially erroneous, the judgment is reversed and the case remanded for a new trial.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.