**Don BELL, Beulah S. Drake and Elvin Hubbs, Respondents,**

**v.**

**UNION ELECTRIC COMPANY OF MISSOURI, a corporation, Appellant.**

**No. 23655.**

Kansas City Court of Appeals.

Missouri.

April 1, 1963.

Poague, Brock & Wall, Clinton, H. C. Salveter, Sedalia, Harry H. Kay, Eldon, John A. Woodbridge, St. Louis, of counsel, for appellant.

George H. Miller, Sedalia, Floyd L. Sperry, Jr., Clinton, for respondents.

CROSS, Judge.

This is a tort action in the nature of trespass maintained by three plaintiffs who seek to recover damages for destruction of their crops resulting from the flooding of the Osage River in June and July of 1951, alleged to have been caused by the construction, operation and maintenance, by defendant Union Electric Company of Missouri, of the Bagnell Dam and the Lake of the Ozarks formed thereby. The petition is in three counts, each of which relates to a separate tract upon which the destroyed crops belonging to the respective plaintiffs were grown. Trial was to a jury which returned a verdict in plaintiffs' favor in the aggregate sum of $8,023.00. Defendant has appealed from the judgment.

The Osage River is a natural watercourse which flows generally to the east from the Missouri-Kansas boundary line through the counties of Bates, St. Clair, Benton, Camden, Morgan and Miller to Bagnell, Missouri, thence on to its confluence with the Missouri River near Jefferson City. In the years from 1929 to 1931, defendant constructed a hydro-electric dam across the Osage River near Bagnell at a point about 95 miles east of Warsaw. As a result, the upstream waters of the Osage River were impounded in a large, irregularly shaped lake, known as the Lake of the Ozarks, which extends from the dam upstream in the Osage River channel and spreads out into that river's tributaries. When the level of the lake is maintained at 660 feet above mean sea level, considered to be full reservoir, the impounded waters extend westward to and "feather out" at the County Line Bridge between Henry County and St. Clair County, approximately thirty miles west of Warsaw.[1] The farms on which plaintiffs cultivated their crops are located along the left bank of the Osage River, approximately 26 to 28 miles west of Warsaw. After unusually heavy rains in the months above mentioned, the lake rose to a maximum reservoir level of 664.40 feet at the dam on July 7, 1951.

Plaintiffs' theory of recovery, as stated in the petition, is in substance as follows: (a) that the maintenance and operation of Bagnell Dam across the Osage River caused waters to be impounded so as to form the Lake of the Ozarks; that the impounded lake waters pass through the dam by a number of flood gates; that the water level is controlled by the opening and closing of the flood gates; that defendant had complete control of the dam and all its facilities (including the flood gates), and that control of the lake water elevation was exclusively exercised by defendant; (b) that in June and July of 1951, flood waters from the Lake of the Ozarks overflowed onto plaintiffs' farm lands and injured and damaged their crops; (c) that the retardation of the flow of the Osage River and its tributaries resulting from defendant's operation of the dam has caused silt, sand, gravel, clay and other materials being carried in the water to settle to the bottom, thereby filling up the beds of the river and its tributaries and decreasing the water-carrying capacity of those streams so that in times of heavy rainfall the flood water is not carried away at a normal rate and in normal amounts, thereby causing the said flood water to back up and overflow the lands of the plaintiffs; and, that said overflow and resulting damages would not have occurred except for the presence, maintenance and operation of the dam; (d) that the lake also acted as a retarding agent upon the natural drainage of overflow waters from the river and its tributaries, thereby greatly impairing and decreasing the natural flood water-carrying capacity of the river and its tributaries, and thereby contributing to cause the overflow of plaintiffs' lands and contributing to cause flood waters to remain upon said lands and damage plaintiffs' crops; (e) that plaintiffs' crops were destroyed as a direct result of the construction, maintenance and operation of the dam.

In Count One of the petition it is alleged that plaintiff Don Bell was the owner of certain lands and the owner of the crops that were destroyed. Count Two contains allegations that plaintiff Beulah Drake was the owner of certain real estate and the owner of one-half the crops thereon, and that the crops were destroyed. In Count Three it is alleged that plaintiff Elvin Hubbs was the owner of one-half of the crops grown on the Beulah Drake farm and that the crops were destroyed.

Defendant, by answer, admitted the corporate existence of defendant and its

1. For a full description of Bagnell Dam and the Lake of the Ozarks, see: Ferguson v. Union Electric Co. of Missouri, Mo. Sup., 282 S.W.2d 505; Kennedy v. Union Electric Co. of Missouri, 358 Mo. 504, 216 S.W.2d 756; Grace v. Union Electric Co. of Missouri, 239 Mo.App. 1210, 200 S.W.2d 364.

ownership and operation of the dam and denied all other allegations of the petition. By way of affirmative defense, the defendant pleaded that the rainfall which caused the 1951 overflow was an act of God, but abandoned that defense when the case was submitted to the jury. Defendant further pleaded, as to counts two and three, that it was relieved of liability because of an easement granted by plaintiff Beulah Drake.

Plaintiffs introduced voluminous evidence tending to show that before the dam was built the Osage River was a clear, free-flowing stream, with gravel bars and shoals, but that since the dam was constructed the river has silted up, and its water flows more slowly; and, that there are extensive and deep silt deposits in the main stream channel, on the islands, the sloughs, and the banks of the stream. There is a silted area at Brill's Hill near Warsaw extending out a distance of 150 to 200 feet that is 10 to 15 feet deep. Toehead Island at Warsaw and the adjoining slough are silted up level with the river bank to a depth of 15 to 20 feet. There are silt deposits around Wingate Island as deep as 60 to 70 feet. The mouth of the Pomme de Terre River (formerly deep water) has been silted to a depth of about 12 feet except for a small channel. Dean Island is silted and mudded over. Silt is ten to twelve feet deep at Smart Island. There are large silt deposits near the Bells' farm and silting in sloughs and around islands appears as far west as the County Line Bridge.

It was the testimony of plaintiffs' witnesses that the river channel had been restricted from 30 to 35 per cent at Brill's Hill, about 25 to 30 per cent at Wingate Island and 33⅓ per cent at Smart Island. Since the dam was built there is more back water and it stays longer. In the vicinity of the Breshears farm there was more rainfall in 1929 and in 1935 than there was in 1951, but the river got higher in 1951 than in 1929 or 1935. Plaintiffs' lay witnesses testified that since the dam was built and the lake formed it takes less rainfall to put the river out of banks and the flood waters stay

up longer; that when moving water of the river hits slower water it doesn't get away as fast; that the land overflows more often, more quickly, and with less amount of water.

Plaintiffs introduced in evidence answers made by defendant in response to interrogatories, which show that there were 12 floodgates in the dam, each 23 feet by 34 feet in size, with a total capacity to pass water varying from a volume of 148,800 cubic feet per second at lake level of 660 feet, to a volume of 190,800 cubic feet per second at lake level of 664 feet; and, that these flood gates can be opened to full capacity from a closed position in from 5 to 10 minutes. Plaintiffs also introduced in evidence, as exhibits, copies of the "Osage Plant Operating Data" for the months of June and July of 1951 which had been furnished by defendant in response to plaintiffs' interrogatories. These are permanent records kept by defendant which show the condition of the lake from day to day and reflect the details of the daily operation of the floodgates during the named months. The "operating data" discloses the following facts: throughout June of 1951 the lake level remained below 660 feet until the 25th day of the month; beginning on that day the lake level began to rise above 660 feet and steadily, day by day, rose to a maximum of 664.40 feet by July 7th; beginning on June 24th, there was a sharp rise in the "inflow" from river waters, which increased from 68,000 cubic feet per second on that date to 133,500 cubic feet per second on July 6th, and 122,500 cubic feet per second on July 7th (the day of maximum lake level); in the month of June the floodgates were first opened on June 24th; on that day defendant "wasted" 12,400 cubic feet per second through the flood gates and daily increased the "waste" to 98,000 cubic feet per second July 7th; it appears that on each day from June 24th to July 7th, the "inflow" exceeded the "wastage" through the flood gates which had a daily capacity to exhaust water which exceeded the corresponding daily amount of "inflow".

Darrell Adams, an engineer testifying for plaintiffs, stated that the presence of the silt deposits indicated that velocity of the river waters had been slowed, and that their flow was retarded both by the silt deposits and by the presence of the lake acting as an obstruction to the river channel. Mr. Adams stated that in his opinion the 1951 flood was caused by the fact that the lake prevented the river waters from flowing naturally and caused the waters to "spread out", and because the defendant "stored" water in the latter part of June and in the first part of July and thereby let the lake level get higher and higher. The witness testified that "the main reason (for the 1951 flood) was the fact that the flood gates weren't open", and, that the water was retarded and caused to reach a higher flood level because defendant was "storing water and letting the lake level get higher and higher".

Defendant also introduced evidence in great volume, including statistical data relative to the 1951 and prior floods, rainfall records, profiles of flood crests, river cross section charts, high water and river velocity records, aerial survey photographs and various other technical data.

It was defendant's evidence that some silting had accumulated in the river but that there was no restriction of the channel from silting at Smart Island, at the mouth of the Pomme de Terre, or at Wingate Island; that the silting at Brill's Hill amounted to only 10 per cent, and that flow conditions were better there than before the dam was built; that silting below Heath Bridge amounted to less than 5% and less than 2% above that point; that silting in the area of the Bell and Drake farms was negligible; and, that there is no silting on the Warsaw side of Walthal Island. Defendant's engineer witnesses testified to the effect that if the dam and lake had never been built the 1951 flood would have been the same on plaintiffs' farms; that the silting of the river had no effect on the water flow at the Bell and Drake farms; that it was impossible for the lake to have

had any influence in causing the flooding of the farms in question, that the lake did not cause the flood waters to "back up" on those lands, and that plaintiffs' farm lands would have been flooded and their crops destroyed if the dam and the lake had not been in existence.

In submitting the issues to the jury the trial court gave Instruction No. 1, plaintiffs' verdict-directing instruction, which reads as follows:

"The Court instructs the jury that if you find and believe from the evidence that in the months of June and July, 1951, the defendant Union Electric Company, owned and operated a hydroelectric dam across the Osage River at Bagnell, Missouri; that said dam impounded the water of the Osage River and its tributaries, creating a lake or reservoir, which at the state of 660 feet above mean sea level extended from Bagnell, Missouri, to approximately the County line between Henry and St. Clair Counties; and that plaintiffs' farms in question adjoined said lake or reservoir and Osage River as it existed approximately 25 miles above Warsaw, Missouri; and if you further find and believe that as a result of the construction, maintenance and operation of the dam at Bagnell, silt deposits had been formed in the channel and along the banks of the Osage River in and around Warsaw and to a lesser degree at the various places mentioned in evidence upstream to the vicinity of plaintiffs' farms by June of 1951, and that said silt deposits retarded the flow of the Osage River in the vicinity of plaintiffs' farms in the latter part of June and early part of July, 1951, thereby contributing to cause the flood waters of said Osage River to go upon plaintiffs' croplands in question and destroy the crops in question; and if you further find and believe that in the latter part of June and early part of July, 1951, the water in the lake or reservoir was at such elevation that

said lake acted as a retarding agent to the natural flow of the Osage River in the vicinity of plaintiffs' farms, thereby contributing to cause the flood waters of said Osage River to go upon plaintiffs' croplands in question and destroy the crops in question; and if you further find and believe that in the latter part of June and early part of July, 1951, the floodgates at the dam at Bagnell were so operated by the defendant as to contribute to cause the floodwaters of said river to go upon plaintiffs' cropland in question and destroy plaintiffs' crops in question; and if you find and believe that these three things above set out, that is: first, the silting described in evidence, if you find that said silting did exist, second, the presence of the lake or reservoir at such height as to act as a retarding agent to the natural flow of the Osage River in the vicinity of plaintiffs' farms, and third, the operation of the floodgates at the dam, combined together were the cause of the floodwaters of the Osage River going upon plaintiffs' cropland in question and destroying the crops in question; and if you further find and believe from the evidence, that under all the conditions then and there existing plaintiffs' crops would not have been flooded and destroyed had it not been for the construction, maintenance, and operation of said Bagnell Dam by defendant, then your verdict should be for the plaintiffs and against the defendant".

It is not disputed by defendant that plaintiffs' croplands were flooded in June and July of 1951 and that their crops were destroyed. It was established by uncontradicted evidence that the crops were growing on lands lying above an elevation of 673 feet and that they were destroyed by flood waters rising above that level. No point is made that plaintiffs were not damaged. Nor does defendant claim that plaintiffs failed to make out a submissible case on their pleaded theory.

■■■ Defendant's first complaint in this appeal is that there is a fatal defect of parties plaintiff as to Count One. Defendant says it is shown by the evidence that Don Bell, the sole named plaintiff in Count One, was not the sole owner of the land described therein, but that it was owned jointly by plaintiff Bell and Lora M. Bell, his wife, as tenants by the entirety. Therefore, defendant argues, plaintiff Bell was not entitled to maintain the action since his wife was jointly interested with him in any action for trespass upon the jointly owned real estate and should have been named as a party in Count One under the provision of Section 507.030 V.A.M.S. (Civil Rule 52.04(a), V.A.M.R.) which requires that "persons having a joint interest shall be made parties and be joined on the same side as plaintiffs or defendants."

Without determining whether or not it is established by the evidence that the Bell farm was owned by plaintiff Bell and his wife by the entirety, and even assuming title was so held, we necessarily rule that it was not incumbent upon plaintiff Bell to prove that he was sole owner of the realty upon which the crops were grown in order to maintain the present suit to recover damages for their destruction by defendant's alleged wrongful acts. The action is not for damages to the freehold—the land as such. The recovery sought is for damages to growing crops which, according to the evidence, belonged to plaintiff, Don Bell, as owner thereof. From that testimony we may further assume that the crops were in his possession. "An injury to annual crops or growing grass is, as a general rule, an injury to the possession, and the right of action therefor is in the tenant alone. The landlord may not sue therefor. * * * One working his wife's land by her permission and receiving the proceeds thereof may maintain an action in trespass for damage to his crops". 15 Am.Jur. Section 60, p. 250. It is stated in 87 C.J.S. Trespass § 29, pp. 983–984, that "One who owns a certain specific thing which is a part of another's realty can

maintain trespass quare clausum for an injury to it. * * * The rule has been held to apply to growing crops". And, the following rule is stated in 93 C.J.S. Waters § 36(6), p. 661: "Possession is sufficient to enable plaintiff to maintain an action against one who wrongfully floods the land, so that an action may be maintained by one who is in possession by license * * or lease".

As against a mere tort-feasor, actual possession of land is alone sufficient to maintain trespass, although such possession is altogether unsupported by evidence of title, and even though it affirmatively appears that plaintiff is without title. That doctrine applies where possession is by permission of the owner. 87 C.J.S. Trespass § 24, pp. 976–977. In Robertson v. Welch, Mo.App., 246 S.W.2d 828, this court said: "In our opinion, it is not necessary or material in this case to determine where title to the timber was, since the Missouri cases uniformly hold that an action in trespass can be maintained against a trespasser by a party in possession". In the frequently cited case of Reed v. Price, 30 Mo. 442, it is stated: "The law has been too long and too well settled to render it necessary to cite authorities in support of the position that possession is sufficient to maintain an action of trespass". Also see Watts v. Loomis, 81 Mo. 236; Hoelmer v. Heiskell, 359 Mo. 236, 221 S.W.2d 142; Allen v. Wehrman, Mo.App., 204 S.W.2d 464; Chappee v. Lubrite Refining Co., Mo.App., 89 S.W.2d 543.

Cases cited by defendant holding that ownership of realty carries with it a presumption of ownership of growing crops are not persuasive on the question. If any presumption to that effect arose in this case, it was overcome by the undisputed evidence that plaintiff Bell was owner of the crops in question. Defendant also relies on Robertson v. Welch, supra. The cited case is of no benefit to defendant because there the plaintiff's right to sue for trespass arose from the fact that she had *possession* of certain timber involved—not because she had record title to the land on which it stood.

It is our conclusion that plaintiff Don Bell was entitled to maintain his action for damages in Count One.

Defendant next insists that Beulah S. Drake and Elvin Hubbs, plaintiffs respectively in Counts Two and Three of the petition, are not entitled to recover because Beulah Drake, the owner of the land involved, had executed an easement granting defendant the right to flood the lands up to an elevation of 673 feet. Defendant says: "Plaintiff Beulah H. Drake released the defendant from all claims for damages of every kind and description whatsoever to the part of the land lying above elevation 673 caused by the water reaching said contour line or any lower elevation. Plaintiff's causes of action were based upon conditions which resulted from the defendant holding water in the river to elevations below 673 feet".

The easement referred to was executed by Beulah S. Drake and George W. Drake, her husband, on February 9, 1931, in the form of a warranty deed which, in conventional language, granted defendant certain lands (a portion of the farm in question) described as *"lying below contour line of 673 feet* above mean sea level as now marked and established on said land, the buyer hereby released from all claims for damages of every kind and description whatsoever to the part of said land lying above said contour line *caused by the water reaching said contour line or any lower elevation"*. (Emphasis supplied.) The instrument granted defendant the easement right, with respect to the demised lands, quoted as follows:

"To back water, over or under, submerge or otherwise damage said tracts of land through backwater *of* otherwise, whether caused by flooding, erosion, seepage, ground water, lack of drainage, obstructed drainage, or in any

manner resulting from the construction, operation, and maintanace of the dam, power plant and works appurtant thereto located in, across or along or adjacant to the said Osage River at approximately Mile 75 on said River in Miller County, Missouri and constructed in accordance with the plans now or hereafter made and approved by the Federal Power Commission for Project No. 459. Said dam, power plant and works appurtant thereto shall be designed to hold water at the dam at approximately 660 feet above mean sea level;".

Although it is clearly shown by the evidence, without dispute, that the crops owned by plaintiff Drake and plaintiff Hubbs (her tenant) were growing on land lying *above the contour line of 673 feet,* and were destroyed by flood water which reached *above the contour line of 673 feet,* it is still insisted by defendant that it is released from liability for the crop damage sued for in counts two and three by the terms of the easement. Defendant argues, in effect, that the conditions which plaintiffs claim caused the flooding of their lands (above an elevation of 673 feet), to-wit, the silt deposits, the presence of the lake, and its retarding effect on the flow of the river, were the result of defendant's *maintenance* of the lake at a normal elevation of (approximately) *660* feet—therefore, the flooding of plaintiffs' lands (due to the silting, the retarding effect of the lake, and the presence of the lake) was caused by water which did not reach *above* the level of 673 feet. Hence, says· defendant, since plaintiffs' damages were caused by water "reaching said contour line or any lower elevation", the release operates to defeat plaintiffs' claims.

We do not accept the foregoing theory. Defendant's proposed interpretation of the release is, in our opinion, contrived and illogical. We read and understand the instrument according to the plain, ordinary and usual meaning of the language it contains. We consider it to be a grant to defendant of the unlimited right to flow water upon the Drake farm *up to the level of 673 feet, but no higher.* If the parties had intended that defendant was to be relieved of liability for the consequences of flooding by water *actually rising upon the surface of the land above the contour level of 673 feet,* they should have so provided in the contract. The only provision affecting the land above the level of 673 feet is the clause " * * * the buyer hereby released from all claims for damages of every kind and description whatsoever to the part of the said land lying above said contour line caused by the water reaching said contour line or any lower elevation". We are in agreement with plaintiffs that the only intelligent construction of the quoted provision would be that if the water came upon plaintiffs' lands and reached the elevation of 673 feet, but no higher, and caused damages to their property above that elevation by percolation or other physical means (resulting from the presence of the water lying below 673 feet), then the defendant would not be liable.

We believe that the parties were contracting in reference to a direct, immediate agency of destruction, i. e., flood waters that might actually flow and lie upon the lands—not in reference to the remote and secondary consideration involving the *normal* operation of the lake, as contended by defendant. It is necessarily our conclusion that defendant had no easement of right to flood the croplands described in counts two and three.

In two remaining assignments defendant complains of error in plaintiffs' verdict-directing Instruction No. 1. The first complaint of the instruction is that it permitted the jury to find that the floodgates were so operated as to contribute to the flooding of plaintiffs' crops "without requiring the jury to find what operations of the floodgates contributed to cause the flood waters to go upon the plaintiffs' crops or what operations had anything to do with raising the level of the water at plaintiffs' farms".

■ This contention is grounded on the rule stated in Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496, that "Where the evidence presents two or more divergent sets of essential facts, under one or more of which plaintiff would be entitled to recover and under one or more of which he would not, then a verdict-directing instruction or instructions given in his behalf should hypothesize, either by recital or by reference to other instructions, the facts essential in law to support the verdict." Attempting to invoke the foregoing rule, defendant insists that the instruction should have hypothesized facts showing in what "particular manner" it had operated the dam floodgates, so as to raise the water level at plaintiffs' farms, and should have required the jury to find those facts before they could arrive at the ultimate conclusion that the defendant's operation of the floodgates contributed to the flooding of plaintiffs' crops.

The weakness of defendant's position lies in the fact that the evidence does not contain "two or more divergent sets of essential facts" relating to the operation of the floodgates. There is only one set of facts in the record to show how defendant manipulated those instrumentalities at the time in question. These facts were supplied by the defendant itself in response to interrogation, consist of undisputed record evidence, are uncontradicted by any other evidence, and are to the conclusive effect that the floodgates were operated by defendant to less than their capacity with the result that lake water was "stored" and caused to rise in elevation.

■ It is hornbook law that reversible error is not committed by omitting from an instruction the specific hypotheses of fact which are undisputed and in effect conceded. "Where there is no divergence in or denial of the essential facts, then the ultimate issue of the negligence pleaded and its being the proximate cause of the injury or damage alleged may be submitted by reference to the facts and circumstances shown by the evidence without specific hypothesization in the instructions. And, we may add, that if either of the parties deems a hypothesized fact or situation not to have been clearly or sufficiently hypothesized in any instruction, he should offer a clarifying or amplifying instruction." Hooper v. Conrad, supra.

This rule was applied in Breshears v. Union Electric Company of Missouri, Mo. Sup., 313 S.W.2d 638—also an action in trespass to recover damages resulting from flood water. The court pointed out in its opinion that there was no contested issue in the case as to the existence of the "conditions" which plaintiffs claimed contributed to cause flooding of their lands and damage to their crops. The claimed conditions related (as they do in this case), to the construction, maintenance and operation of defendant's lake, and its installations, including floodgates, and the presence of accumulated silt, and the retarding effect of the lake. Rather, the court stated, the real issue was as to whether, under those *admitted* conditions, plaintiffs' lands would have been flooded except for the construction, maintenance and operation of the dam and installations. For those reasons, the court held that plaintiffs' verdict-directing instruction was not reversibly erroneous in failing to require findings of fact by the jury as to the noted "conditions" which were not the subject of controversy. The court further observed that if defendant deemed the hypotheses contained in the instruction too general or insufficient, it should have offered clarifying or amplifying instructions. We consider the case controlling here.

The defendant cites and relies upon a later "Breshears case"—Breshears v. Union Electric Company of Missouri, Mo.Sup., 347 S.W.2d 233. In that case, unlike the *first* Breshears case, the court found there was "sharp conflict" as to the "conditions then and there existing", as distinguished from the *effect* of admitted conditions. For that reason, the court determined that plaintiffs' verdict-directing instruction was

erroneous in failing to require findings of fact essential to plaintiffs' recovery. We do not regard the case as supportive of defendant's present contention.

Defendant *implies* in its reply brief that the jury should have been required to find that the "admitted facts" shown in evidence "constituted negligence and that such negligence was the proximate cause of plaintiff's injury". Let it be remembered that this is *not* a case founded on negligence, but is a suit in the nature of trespass. The defendant is aware of that fact because it states in its brief, "This was an action for damages in the nature of trespass upon real estate". Therefore, the defined attributes of an action in trespass which are stated by Commissioner Houser in Corrington v. Kalicak, Mo.App., 319 S.W.2d 888, are presently applicable. We quote: "While a trespass often arises out of or is accompanied by an act of negligence, liability for trespass may be wholly independent of any act of negligence. Negligence is by no means a necessary element in trespass and liability may be imposed for damage to property naturally and necessarily resulting from trespass, regardless of negligence. * * * The basis of liability (for damages caused by overflow of the waters of a natural watercourse by reason of an obstruction) is the fact that the obstruction causes the water to overflow, encroach upon and inflict special damage to the property of another. It is the impounding of the waters to such an extent that an overflow occurs and a trespass results—a wrongful act—which fixes liability. Whether the impounding of the waters is intentional or accidental, whether the overflow is caused by negligence or without negligence, the agency obstructing the flow and causing the overflow of the waters of a natural watercourse to the damage of adjacent property owners

is liable for its misfeasance in an action of trespass."

Since plaintiffs have chosen to base this action on trespass—not on the theory of negligence—they are not bound by the essential requirements inherent in the latter remedy. It is not plaintiffs' burden in this case to prove or submit any hypothesis of defendant's negligence or proximate cause related thereto.[2]

It is our conclusion that the instruction adequately hypothesizes facts in reference to defendant's operation of the floodgates.

Defendant's final contention is that the last clause of Instruction No. 1 constitutes a roving commission to find for plaintiffs on the consideration of "any conditions—whether such conditions were alleged in the pleadings or whether the defendant was responsible for the conditions or not". The instruction is not erroneous in the respect charged. It requires specific findings on the three hypotheses of causation submitted by plaintiffs, to-wit: the silting, the retarding effect of the lake, and the operation of the floodgates. See: Breshears v. Union Electric Company, Mo.Sup., 313 S.W.2d 638; Ferguson v. Union Electric Company, Mo.Sup., 305 S.W.2d 401; Cunningham v. Union Electric Company, Mo.App., 221 S.W.2d 758. Our reading of the second Breshears case, on which defendant relies, does not disclose any expressed disapproval of the clause in question as a proper statement of the law when incorporated in a verdict-directing instruction which hypothesizes the *contested* issues of fact.

The judgment is affirmed.

All concur.

2. Cf. Ferguson v. Union Electric Company of Missouri, Mo.Sup., 282 S.W.2d 505.