William J. TURPIN and Ann W. Turpin, his wife, Plaintiffs–Appellants,

v.

David L. WATTS and Karen A. Watts, his wife, Defendants–Respondents,

and

Robert H. Margolin, Trustee, and Indian Springs State Bank, a Kansas Banking Corporation, Defendants.

No. 10962.

Missouri Court of Appeals, Southern District, Division Two.

Nov. 7, 1980.

John L. Walker, Phillips, McElyea, Walker & Carpenter Corp., Camdenton, for plaintiffs–appellants.

John E. Curran, Lewis Z. Bridges, Curran & Loraine, Osage Beach, for defendants–respondents.

HOGAN, Judge.

This is an action for a mandatory injunction. Plaintiffs and defendants, to whom we shall refer in the singular, own adjoining lakefront lots situated on the Osage arm of the Lake of the Ozarks. Alleging that defendant had violated a restrictive covenant by constructing a residence lakewards of a setback or building line, thereby obstructing his view, plaintiff sought to compel defendant to move the residence to comply with the restrictive covenant. The cause was tried to the court sitting without a jury. No request for findings was made by either party. The trial court entered a general finding for the defendant. Plaintiff appeals.

In May 1955, a now defunct corporation subdivided a tract of land situated in sections 4 and 5, township 39 north and sections 33 and 34, township 40 north, range 16 west, in Camden County. The land subdivided includes fractional lots, but the leg-

end on the plat indicates the tract contains 50 to 60 acres. This subdivision is called the Shawnee Bend Subdivision No. 3. It extends into the Osage arm of the lake from the south and abuts the lake on the west, north and east.

In 1972, Gerald Stonitsch and Nunzio Restaino owned Lots 51 and 51A of the Shawnee Bend No. 3. Stonitsch and Restaino subdivided and platted these lots as a new subdivision, called Chimney View Estates. Chimney View Estates is a finger of land which projects into the Osage arm of the lake from south to north along and upon the section line which divides sections 33 and 34 in township 40 north. Chimney View Estates is divided into 12 lots. Lots 1, 2, 3, 4 and half of Lot 5 abut the lake on the east. We are concerned with Lots 3 and 4. Plaintiff's property is Lot 3; defendant owns Lot 4, upon which the allegedly offending residence was constructed. The shoreline of Lot 4 meanders from southeast to northwest a distance of 90 feet more or less; the lake frontage of Lot 3, which adjoins Lot 4 on the south, is 75 feet more or less. The plat bears the following legend, among others:

"No building shall be erected between the 20 foot minimum building line and the 660 countour [sic] line of the Lake of the Ozarks."

The "building line" or setback is sketched along the perimeter of the subdivision. By warranty deed dated March 6, 1973, Stonitsch, Restaino and their wives conveyed all of Lots 3 and 4 to defendant and his wife. The parcel conveyed is described as follows:

"All of Lots 3 and 4 in Chimney View Estates, a subdivision, filed for record in Book 14 at page 82 in the Camden County Recorder's Office, being a resurvey of Lots 51 and 51A in SHAWNEE BEND NO. 3, all as shown on the plat of said subdivision filed for record in Plat Book 4, page 27, Office of Recorder of Deeds, Camden County, Missouri. Subject to restrictions, reservations, conditions and easements of record . . . ."

Perhaps of necessity, the parties' proof was diffusely presented, but it would serve no useful purpose to recount all the evidence at length. Consideration of three factual aspects of the case is all that is necessary to an orderly disposition of the appeal.

To begin with, the actual location of the setback—on the ground—was a matter of factual dispute in this case. Both parties produced surveyors and the private surveys each had prepared. Plaintiff called a Mr. David Slagle, a registered land surveyor with several years experience. This Mr. Slagle had surveyed the Chimney View subdivision for Stonitsch and Restaino, and was familiar with the "restrictions [setback] contained upon [the] plat." Shortly before trial Mr. Slagle had been employed to "determine all of the dimensions" of defendant's residence, "and the relation of the [defendant's] house to the building line and to the original 660 contour line." Mr. Slagle explained that "the ground [had] been changed." Asked how it had been changed, the witness further explained that the lakefront part of defendant's lot—Chimney View Lot 4—had been "filled in" so the "land area" of the defendant's lot was extended out into the lake on the east. Further elaborating, Slagle testified that on the Chimney View plat, "the 660 line [was] shown as a crooked line because we actually established the [shore] line by taking the elevation." When he made his most recent survey, Mr. Slagle found the original pin which marked the 660 line had been covered over, so he established the location of the pin by "drawing a straight line" between lots 5 and 4. This survey, received in evidence as plaintiff's exhibit 3, indicates that defendant's residence protrudes across the "original" setback 17.5 feet on the south (adjoining plaintiff) and 4 feet across that line on the north. A concrete walk in front of the residence protrudes even further. On cross–examination, Mr. Slagle testified that the setback had been "sketched freehand" on the original Chimney View plat, and that actual bearings had not been taken before the setback was sketched in. Further cross–examination disclosed the witness had made a previous survey of the

defendant's residence on Lot 4 at plaintiff's request. Mr. Slagle was examined closely about both surveys; it is sufficient here to say that that examination disclosed Mr. Slagle made a number of assumptions, and there are probably inaccuracies in both surveys.

The defendant also called a registered land surveyor, one Dexter Slagle. This witness had been surveying Camden County land for nearly 21 years. In February 1977, he was employed by the defendant "to locate the . . . lot lines on lots 3 and 4 [in Chimney View subdivision,] [a]lso to locate . . . all the buildings located upon those lots, to get elevations on the lot corners and locate sea walls existing, sea walls and locations or elevations of those walls." This witness had also drawn a plat, based on the data he obtained. The plat is before us as defendant's exhibit C.

This witness testified that he and his crew "had difficulty" locating the 660 contour line because a rock retaining wall had been built "beyond," i. e., lakewards, of the "original" 660 line, "and there had been a fill made behind that wall which made it impossible to locate the original 660 contour line." This witness had attempted to locate both the original 660 line and the building line on the ground, but was unable to do so because, according to his calculations, the pins marking the original 660 contour line had been set slightly above 660 feet. The witness expanded this remark by saying that it would be difficult at any time to relocate any particular course which followed the 660 contour line because the shoreline of the lake " . . . changes periodically. It leaches away or people build it up and extend it out into the Lake [sic] further."

This witness was then shown defendant's exhibit C, the plat or private survey he had prepared for the defendant, and his interrogation proceeded thus:

"Q. Now with respect to [plaintiff's] residence . . . and [defendant's] residence . . ., does your survey work indicate that there is more than 20 feet from the now existing 660 contour, and [both] those residences?

A. As the 660 is now located?

Q. Yes, sir.

A. Yes, it would be more than 20 feet."

The force of this testimony was considerably diminished by the witness' testimony that he had located the 660 contour line by calling the Union Electric Company at Lake Ozark, asking the "lake level" for the particular day, and by using their advice as a basis "for getting our elevations."

There is other evidence concerning the retaining wall, or "sea wall" which was constructed around the perimeter of the Chimney View subdivision. Mr. Stonitsch testified that he and his partner constructed a sea wall around the whole subdivision, but the exhibits indicate an "old" and a "new" sea wall, and Mr. Stonitsch did not distinguish the two. The defendant at one point indicated that he and "the developers" constructed a sea wall along the shoreline of his lot and plaintiff's lot after defendant purchased the lots, but his testimony leaves one in doubt when the "old" sea wall was replaced by the new one. The place, purpose and dimensions of both walls was only most vaguely developed.

Two other factual aspects of the case must be considered. The course of dealing between the plaintiff and the defendant is of considerable importance. Plaintiff testified that he became interested in buying his lakeshore property–Lot 3 in Chimney View subdivision–about the middle of November 1975. Lot 3 had a residence on it; Lot 4 was unimproved. Plaintiff negotiated with defendant and on December 4, the parties entered into a contract for the sale and purchase of Lot 3 and some miscellaneous chattels.[1] For the total sum of $52,000 plaintiff was to receive Lot 3, together with the improvements thereon; defendant was to provide a title insurance policy; the sale

1. It is typical of the state of confusion of this record that the contract is for the sale of Lot 4; nevertheless it stands admitted by the pleadings that defendant sold Lot 3 and retained Lot 4.

included a good deal of furniture, "major" appliances, a boat and a boat dock. At plaintiff's request, "closing" was deferred to April 3, 1976.

In March 1976, plaintiff observed stakes on Lot 4. Plaintiff testified he spoke to the defendant, telling defendant he was "entirely too close" to the setback. Defendant replied that he could not build "further back" because dynamiting would be required, and defendant was unable to obtain a permit to blast. Plaintiff rejoined: ". . . change your style of house."

On cross–examination, plaintiff was asked if, in March, defendant did not offer to rescind the whole transaction. Plaintiff's testimony was that defendant only offered to move plaintiff's furniture back to Kansas City; counsel went over the offer of rescission several times, but plaintiff denied that defendant ever offered to make full restitution. Plaintiff nevertheless signed the contract, watched the construction proceed, and finally commenced this action on July 16, 1976.

Defendant's testimony about his offer to rescind was considerably different. His testimony was that in March 1976, plaintiff was "very objectionable to the constructing on [defendant's] property." Plaintiff became irate, according to the defendant, and defendant "told [plaintiff] [defendant] would be happy to give [plaintiff] his money back and pay for the boat and pay for the shipping of his furniture back to Kansas City." Defendant "even offered to go to the house and make the telephone call to cancel the real estate contract that was made at that point." Defendant's evidence was that his construction was three–fourths complete when this action was commenced.

A final factual aspect of the case to be noted is the gross disproportion between the injury proved and the relief sought. Defendant's surveyor, as noted, produced a number of plats or surveys. Defendant's exhibit D was designed to show the "percent of view" defendant's residence blocked or shut off beyond the setback. The defendant's surveyor then testified as follows concerning his calculations which were incorporated into exhibit D: (our emphasis)

"Q. With respect to the percentage of the loss of view on the side of [plaintiff's] house closest to the common lot lines between 3 and 4, what is that percentage?

A. Upon which side?

Q. The closest side of the house, closest to the common lot line between 3 and 4.

A. *It would be 3.9 percent.*"

By comparison, there was evidence that the cost of razing and reconstructing defendant's residence, assuming salvaged materials were used, would be about $39,000.

■ As the plaintiff candidly states in this court, the trial court's order is barren of any grounds upon which it based its conclusion and one cannot know the basis for its decree or order. We agree; we might go further and note once again that a general finding, even when it is accompanied by a voluntary statement of the trial court's reasons for decision, presents no question for review except as a general finding. *Conley v. Crown Coach Co.*, 348 Mo. 1243, 1251, 159 S.W.2d 281, 285[8] (1942); *Pallardy v. Link's Landing, Inc.*, 536 S.W.2d 512, 515[1] (Mo.App.1976); *Swetnam v. U. S. By–Products Corporation*, 510 S.W.2d 829, 839[1] (Mo.App.1974). The judgment is presumptively correct, and the plaintiff has the burden of demonstrating that the judgment is erroneous. *Massman Construction Co. v. Kansas City*, 487 S.W.2d 470, 478[6] (Mo.1972); *Pallardy v. Link's Landing, Inc., supra*, 536 S.W.2d at 515.

■ The plaintiff has called our attention to *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976), wherein Mo.R. Civ.P. 73.01.3 was authoritatively construed, urging that in three respects, the judgment entered was against the weight of the evidence and the law was misconstrued. In our view, the fundamental flaw in plaintiff's case is that he never established the true location of the building line or setback on the ground. In his brief, plaintiff flatly asserts: "The 660 foot contour line of the Lake of the Ozarks is the line to which the

water reaches at full reservoir which has been determined to be 660 feet above mean sea level. This contour elevation marks the boundary line of the lake bottom to which Union Electric Light and Power Co. and its successors hold fee title." There is no record evidence of any order to indicate this flat statement is true. We suppose we may notice, as a matter of historical fact, that Union Electric Company of Missouri owns and operates a hydroelectric dam at Bagnell, Missouri, which impounds the Osage River and its tributaries to form the Lake of the Ozarks. We may further know that the lake so created is 129 miles long, has 1,375 miles of shoreline and a surface area of 64,000 acres. As much has appeared in our Official Manual from time to time,[2] and in general, courts know geographical facts and matters of current history. *Reineman v. Larkin*, 222 Mo. 156, 170, 121 S.W. 307, 311 (1909); *Moulder v. Webb*, 527 S.W.2d 417, 419 (Mo.App.1975). Nevertheless, we cannot fairly take notice of specific adjudicative facts necessary to establish a litigant's rights when the reported cases clearly show that Union Electric's easement level varies from place to place along the shore of the lake. See, e. g., *Ferguson v. Union Electric Company of Missouri*, 282 S.W.2d 505, 506 (Mo.1955) (easement levels varied from 667 to 673 feet); *Bell v. Union Electric Company of Missouri*, 367 S.W.2d 812, 819 (Mo.App.1963) (contour line established at 673 feet). The plat of the Shawnee Bend subdivision shows that the tracts in question are subject to easements retained by Union Electric, and that the extent and nature of those easements are of record; nevertheless, the only assurance before this court that the 660 foot reservoir level establishes a point of reference from which the setback should be measured comes from the plaintiff's brief. We cannot supplement the record on the basis of statements appearing only in the briefs. *Landers v. Smith*, 379 S.W.2d 884, 887[4] (Mo.App. 1964); *E. C. Robinson Lumber Company v.*

*Lowrey*, 276 S.W.2d 636, 644[21] (Mo.App. 1955). We stress this lack of proof because, as a general rule, when a shore of a body of water, lake, bayou or ocean is made an abuttal boundary, the meander line, mean highwater line or "contour" line is not the legal boundary unless it is expressly so made. See *Conran v. Girvin*, 341 S.W.2d 75, 80[3–5] (Mo. banc 1960); Clark on Surveying and Boundaries, § 259 (4th ed. 1976).

We do not wish to be understood as ruling that surveys or "plats" not commenced at a government corner, or, if that corner is lost, re–established pursuant to statute, will of themselves establish a boundary. The contrary is true. *Burke v. Colley*, 495 S.W.2d 699, 702–703[1, 2] [3] (Mo.App.1973). This action, however, is not an ejectment, title is not in issue, and § 60.150, RSMo 1978, does not prohibit the reception of testimony from private surveyors based on surveys they have made. *State v. Turpin*, 196 S.W.2d 798–799[1, 2] (Mo.1946); *Chostner v. Schrock*, 64 S.W.2d 664, 666[5–7] (Mo.1933); *Rhodes v. Tanner*, 591 S.W.2d 90, 92[4] (Mo.App.1979). In this case, the plats or surveys were received as shorthand renditions of the results of the surveyors' measurements, not as prima facie evidence of the location of the building line on the ground. The Slagles' testimony was properly received "for what it was worth."

The mystifying aspect of the surveyors' evidence was that there was an "old" and a "new" sea wall built around the perimeter of Chimney View subdivision. The trial court was left to speculate, as are we, for what purpose or by what right the "sea wall" was constructed by the littoral[3] owners. It is not even clear who constructed the sea wall.

The probative effect of the defendant's evidence concerning the "new" sea wall was that construction of that wall, and "filling in behind," i. e., landward, of

---

**2.** See Official Manual 1965-1966, p. 1174.

**3.** That the adjective "littoral" includes owners abutting a lake as well as those abutting the

sea, see *Peck v. Alfred Olsen Constr. Co.*, 216 Iowa 519, 245 N.W. 131, 137, 89 A.L.R. 1132, 1155 (1931); Black's Law Dictionary 1083 (Rev. 4th ed. 1968).

the wall, had "extended" lots 3 and 4 in the direction of the lake. Precisely why that was true was not explained by the defendant's surveyor, but if his testimony is accepted, one may conclude that defendant's residence is located landward of the 20 foot building line and there is no violation of the restrictive covenant. The difficulty with this proposition is that, generally, a riparian or littoral owner cannot claim title to land added by accretion or formed by reliction as a result of his own creation of an artificial condition which causes the addition to the land, even though he is entitled, generally, to protect himself against erosion. See Annot., 134 A.L.R. 467, 472 (1941). So, if the "sea wall" were built along and upon the true boundary, and lots 3 and 4 were thereby extended, the "extension" might be lawful; otherwise, defendant acquired no title to the so–called "extension" of his property into the lake. We need not labor the point further. To establish a violation of the restrictive covenant, it was essential for the plaintiff to locate the lakeward boundary of lots 3 and 4; whether his proof was sufficient to establish that basic fact was a question for the trial court, which might well have concluded that neither the lakeward boundary nor the location of the building line on the ground was proved.

We have undertaken all this general and probably imprudent discussion because the record strongly suggests there are issues pendent in the case. Even if the alleged violation of the restrictive covenant were established as clearly as plaintiff contends, we could generate no "firm belief" that the judgment is erroneous because it is against the weight of the evidence, or for any other of the reasons enumerated in *Murphy v. Carron, supra,* 536 S.W.2d at 32[1–3].

■ The only conclusion permitted by the pleadings and the proof is that this is an action upon an express restrictive covenant. There is no claim of encroachment; the evidence completely negatives plaintiff's acquisition of a reciprocal negative easement or implied equitable servitude of the order discussed in *Campbell v. Stout,* 408 S.W.2d 585 (Mo.App.1966). The sole question before the court is whether plaintiff was entitled to a *mandatory* injunction; in all such cases, the chancellor has discretion, and should refuse relief if it would be inequitable to grant relief. *Duncan v. Academy of the Sisters of the Sacred Heart,* 350 S.W.2d 814, 819[5] (Mo.1961).

■ The court is well aware that proof of damages is not essential to an award of mandatory injunctive relief to enforce restrictive covenants. *Rombauer v. Compton Heights Christian Church,* 328 Mo. 1, 17, 40 S.W.2d 545, 552[6] (1931). All the same, "In granting, or refusing to grant, a mandatory injunction to enforce a restrictive covenant ..., the courts apply the general principles of equity with some strictness, and the complainant may often find himself deprived of this remedy by his own conduct ...." Annot., 57 A.L.R. 336, 337 (1928). Two of the basic maxims of equity are that he who seeks equity must have done equity, and that equity aids the vigilant. Upon the record, the chancellor could have found that the defendant offered to rescind the contract and make full restitution before plaintiff ever became bound to purchase lot 3, and the offer was refused out of hand. Further, the chancellor could have found that the plaintiff, aware that his rights were being infringed, allowed the defendant to proceed, to defendant's injury. No temporary restraining order was sought; no legal redress of any order was sought until defendant's construction was almost complete. In addition, there was evidence that violation of the setback restriction was widespread in the Chimney View subdivision. Given these circumstances, the chancellor might well have found the plaintiff estopped to complain. See, as illustrative: *Loud v. Pendergast,* 206 Mass. 122, 92 N.E. 40 (1910); *Meaney v. Stork,* 80 N.J.Eq. 60, 83 A. 492 (1912), aff'd 81 N.J.Eq. 210, 86 A. 398 (1913).

■ More importantly, the relief sought is wholly disproportionate to the injury sustained. Whatever status one accords the testimony of defendant's surveyor, it is clear that the obstruction of plaintiff's "view" is minimal. To compel the

defendant to raze and reconstruct his residence at a cost of nearly $39,000 so plaintiff might enjoy an unobstructed view of the lake would be manifestly inequitable. Relief was rightfully refused upon this ground, if no other. *Forsee v. Jackson*, 192 Mo.App. 408, 411–412, 182 S.W. 783, 785[4, 5] (1916). See also, *Freed v. Miami Beach Pier Corporation*, 93 Fla. 88, 113 So. 841, 52 A.L.R. 1177 (1927). As plaintiff neither prayed for nor proved any money damages, none could have been allowed.

For the reasons noted, the judgment is in all respects affirmed.

All concur.