C. W. KENNEDY and RENA KENNEDY, Husband and Wife, (Plaintiffs)
Respondents, v. UNION ELECTRIC COMPANY OF MISSOURI, a Corporation, (Defendant) Appellant.—No. 40560.—216 S. W. (2d)
**756.**

Court en Banc, November 8, 1948.

Rehearing Denied, December 13, 1948.

*Richmond C. Coburn, Harry H. Kay* and *John A. Woodbridge* for (defendant) appellant.

*F. M. Brady, Edwin F. Brady, Lamm & Barnett* and *D. S. Lamm* for (plaintiffs) respondents.

508

[757] HYDE, J.—Action for damages from flooding plaintiffs' building in May 1943, claimed to have been caused by defendant's dam, built across the Osage River valley at Bagnell in 1931, creating the Lake of the Ozarks. Plaintiffs obtained judgment for $600.00 and defendant appealed to the Kansas City Court of Appeals which affirmed the judgment. [Kennedy v. Union Electric Co., 203 S. W. (2d) 489.] The case was transferred here by the Court of Appeals "because of the general interest in, and importance of, the issues involved." We handed down an opinion herein during our January 1948 Session but thereafter granted a rehearing.

Defendant raises two points: that plaintiffs failed to make a jury case; and that, in any event, there was prejudicial error in permitting non expert witnesses to state opinions that the dam contributed to the height of the flood.

510

Plaintiffs do not contend that the dam was unlawfully or negligently constructed or that it was negligently operated in 1943. Plaintiffs' action is tort in the nature of trespass, on the theory that impounding waters by the dam caused great silt deposits in the Osage River and its tributaries at the head of the lake, raising the beds of the streams, retarding their flow and resulting in an overflow high enough to flood plaintiffs' building. [As to nature of action see 2 Farnham, Waters and Water Rights, 1767, Sec. 547.]

This case was submitted to the jury on an instruction which, among other things, required (for recovery) a finding that "plaintiffs' property would not have (then) been flooded had it not been for the maintenance and operation of the said Bagnell Dam." They were also instructed to find for defendant if they found "that plaintiffs' said property would have been flooded in May 1943 even though defendant's dam had not been in existence at said time." Thus the issue of the effect of the dam was sharply drawn; and defendant makes no complaint concerning this submission. Defendant does now claim that this case should be considered as an action for damages for the appropriation of property under its rights of eminent domain. We make no ruling herein as to whether such a case as this might be tried as such and complete damages for permanent flowage rights assessed. It is sufficient here to say that this case was not tried on any such theory; that the damages herein were not assessed on any such basis; and that defendant made no such request at the trial.

[758] At low levels, the headwaters of the lake made by defendant's dam, are not far above Warsaw, which is 95 miles upstream from the dam. The full reservoir level is 660 feet above sea level. At this level, the water extends up the Osage 125 miles above the dam to the County Line Bridge, thirty miles above Warsaw by river. It also extends up the Pomme de Terre River, which enters the Osage about fifteen miles above Warsaw, to a point about 120 miles from the dam. This is two miles beyond Fairfield, on the Pomme de Terre, where plaintiffs' store building was located. Another large stream, South Grand River, enters the Osage about three miles above Warsaw. Fairfield is about twenty miles from Warsaw by river, according to the distances shown on defendant's map of the reservoir. The drainage area of the Osage River is approximately 15,000 square miles, of which about 14,500 square miles are above defendant's dam. The slope of the bed of the Osage is about ten inches to the mile. The slope of the Pomme de Terre is about three times that of the Osage. Defendant had flowage rights, apparently up to 673 feet, and the elevation of the main street of Fairfield was 676 feet. At the 660 foot level, the water at Warsaw is a foot or two above the bankfull stage of the river. At the crest of the 1943 flood "there were depths near Warsaw of forty-five feet in the main channel and fifteen feet over the banks";

and the water got seven and one-half feet above the 660 foot level near the dam.

Plaintiffs showed that prior to the building of the dam, the Osage and the Pomme de Terre were clear running streams with pools divided by gravel bars and rapids; that there was then no silt around or above Warsaw; but that thereafter the water became muddy and still and heavy deposits of silt were made. Above the middle bridge at Warsaw, which was formerly a swimming place, deposits formed, estimated at fifteen to twenty feet high, with drift lodged therein. At a nearby resort dock so much silt had filled in that large boats could not dock there. Up the river, large sloughs were filled up, sand and gravel bars covered up, channels narrowed by silt deposits along the banks and islands joined to the shore. There were places where the bottom of the river was filled up with mud so that it was shallow nearly all the way across the stream. These silting conditions also existed on the Pomme de Terre and extended above Fairfield. [For further description of this silting see Grace v. Union Electric Co., (Mo. App.) 200 S. W. (2d) 364.]

The flood in May 1943 was eight feet higher at Fairfield than any previous flood. The floor of plaintiffs' building was four feet above the ground and the water got more than four feet deep over the floor. In 1927, the water got on to the main street in Fairfield, coming to the edge of the sidewalk near their building. The only other time when flood water ever got on to this street in Fairfield was in 1895, which was the highest previous overflow of the Osage any of the witnesses could remember. During the May 1943 rains, the Pomme de Terre first came up from the headwaters and overflowed the low bottoms. This overflow did not last more than twenty-four hours but after the water went down, backwater from the Osage backed up and overflowed Fairfield. Things floated up-stream on this backwater, which remained about eight days when there was no flood condition in the Pomme de Terre above the backwater of the Osage. There was more headwater in the Pomme de Terre in 1927, and it never did get as high above Fairfield, in 1943, as it did then.

Plaintiffs had expert testimony (Benberg) to the effect that "what caused the water to back up the Pomme de Terre instead of running into the Lake . . . is that the stream, from the mouth of the Pomme de Terre down toward the Lake is filled up with silt which forms a natural dam and the water, when it hits that dam, has to spread out and it loses velocity and backs up and goes the natural way out this stream here." He further explained thus: "The dam itself causes the water to become placid or still and still placid water is the necessity for silt deposit. . . . Instead of having narrow, deep channels, you are getting a wide and flat channel. . . . The velocity in this water is [759] going to be slower and slower; as the velocity

gets slower the silt deposits and widens out the stream bed, so it's really perpetual silting. . . . You raise the water level as the silting occurs or forms in reality another dam; it dams up the water." He also further testified, as follows: "Q. Mr. Benberg, state whether or not, in your opinion, the silting and filling in of the Osage River, as you observed it at the Green farm there in the vicinity of Fairfield, had any effect with reference to causing water to go back up the Pomme de Terre and flood Fairfield at a time the Osage was at flood stage? A. Yes, its my opinion that that definitely caused the water to back up into the Pomme de Terre. Q. In your opinion, did that have anything to do with causing water to remain there for a period of six to eight days? A. Yes, because it was held back by those silt dams." On cross-examination, he said: "The same amount of water that fell in 1943 could be exactly the same amount that fell in 1935 and not cause a flood in 1935, but causes one in 1943; due to the fact that the river in the meantime had filled up with silt and numerous small dams formed."

Plaintiffs also had the testimony of two farmers (Fergerson and Martin) who had lived near the Osage continuously since the flood of 1895 and had observed conditions throughout the intervening years. They testified as to conditions before and after the dam was built and their personal observation as to the silting of the Osage and Pomme de Terre; and also as to the amount of rainfall locally, in 1943, which they said was less than during some other floods. Mr. Fergerson further testified as follows: "Q. Considering the observations that you have made of floods in years past, during your life, as far back as you can remember and, taking into consideration the filling in that has occurred to these streams you have testified to since the dam was built in 1931 and the amount of rainfall during the 1943 flood and in the years previous—did—in your opinion, did the fact that the dam was in the Osage River cause or contribute this water to rise to the height that it did in 1943? A. I think it did. From my observation the dam contributed to the excess water or flood." Mr. Martin was asked a similar question as follows: "Q. From what you have observed of prior floods and rainfalls during those flood periods and from the 1943 flood, in your opinion did the dam at Bagnell, and the maintenance and operation of that dam since it was built, up to 1943, cause or contribute to the height this flood reached in the Kennedy building at Fairfield? . . . Also taking into consideration the silt deposits, if you observed any in the stream at Warsaw or above there? A. I think the dam was the cause of it, that is my opinion." These questions were fully objected to as improperly obtaining opinions of non expert witnesses.

Defendant's evidence was to the effect that the 1943 flood exceeded the greatest previous recorded flood (1844) in cubic feet of discharge

at Warsaw by 50%. (The 1844 figures were based on estimates not measurements.) Nevertheless, the 1943 flood was of shorter duration in days than the floods of 1922, 1927, and 1929, before the dam was built. It was shown that both before and after the dam was built the Osage backed up into the Pomme de Terre. The records of the United States Weather Bureau for May 1943 showed total rainfall average of forty stations in the Osage watershed of 11.52 inches (May 6 to 11—4.34 inches; May 15 to 20—7.18 inches), while in 1895 there was a 6.18 inches average of sixteen stations, from December 17 to 20; and, in 1927, the average of twenty-two stations was 5.70 inches from April 3 to 9. In 1941, there were 11 inches during October but there were two separate floods, neither as high as in 1943. Defendant also showed 1943 measurements of flow, at Osceola on the Osage, twice the previous volume measured there; at Hermitage on the Pomme de Terre, 78% greater than any other four day period in the history of that gauge station; and at Stockton on the Sac River and Brownington on South Grand River greater than any other flow ever before recorded at those gauging stations; but it was not shown how long these stations had been in existence or what [760] other floods had been measured. Defendant also showed that there was enough in-flow from May 18-22 (200,000 cubic feet per second) ''to have entirely filled the reservoir, if it had been completely empty'' and that since it was filled ''part of this in-flow, we had to pass on downstream, a portion we had to store in the lake.'' (The lake was at a level of 662 feet on May 15, 1942.) Defendant's measurements during the flood showed the water velocity to be 5.15 miles per hour at Warsaw, and there was testimony that the water ran as swiftly there as it did before the dam was built.

Defendant had several expert witnesses who gave opinions that the dam and such silting as had occurred at the head of the lake had no effect on the crest of the flood in Fairfield; that the clearing of the Osage valley, done before filling the lake, greatly increased the carrying capacity of the river (plaintiffs showed that brush and trees had grown back, since 1931, above the normal level of the water); that, under the conditions existing prior to the construction of the dam, the water level would have been higher from the mouth of the Pomme de Terre downstream with the 1943 rainfall than it actually was then, that no one could estimate the carrying capacity of a stream by casual observation of silt deposits in the river bed (defendant had made cross sections of the stream before and after the dam was built to show the amount of silting but these were mostly at Warsaw); that some silting could improve the carrying capacity of the stream by smoothing the channel; that the backwater from the dam had no influence on the height of the water in 1943 above Warsaw; that the cause of the flood was an unprecedented rainfall; and that such a flood would have occurred above Warsaw in 1943 if there had been

no dam in existence. However, it was conceded that silting could affect carrying capacity, raise water levels and retard the flow. On cross-examination, the following statements concerning silting and its effect were made by defendant's experts: (Davis) "The heaviest amounts (of silt deposits) will be at about that location where the water at first strikes slack water and where the deposits will occur, depends on the state at that time, the velocity through there." (Frame) "If your channel filled up to this extent, which is approximately half your entire carrying area, your water for a given flow would flow at a higher elevation" and under such conditions "tends to spread out and back up." (Woodward) "If there were a sufficient amount (of silting) to be appreciable and the stream filled up, it would retard the flow or, perhaps a better way to put it, it will raise water elevations in the stream." It was admitted that there had been some silt deposits since the dam was built but defendant's measurements were near Warsaw and showed the heaviest deposits to be not more than eight feet deep.

Defendant also had an exhibit at the trial, which was not before this court at the first hearing, which charts a comparison of the crest elevations of the 1895 and 1943 floods at various points between Warsaw and Osceola according to its measurements and estimates. It says this shows that the Osage was more than seven feet higher than the 1895 flood above any possible influence of the water impounded by the dam. This chart does show an excess of over seven feet at the County Line Bridge (the upper limit of the lake at 660 feet); but above that point the crests come closer together and at Osceola the difference shown is only about five feet. Below Warsaw this chart shows that the 1943 crest was more than ten feet above the 1895 estimate; and it also discloses that the crest of the 1927 flood on the Pomme de Terre above Fairfield was higher than that of 1943. Thus this chart does show a difference in the height of the flood above the influence of the impounded water and also corroborates the testimony of Fergerson and Martin as to the 1943 situation on the Pomme de Terre.

We think that the evidence of Fergerson and Martin was proper in this case. [See 200 S. W. (2d) 1. c. 370 for cases cited on both sides of this question.] They had both been actively engaged in farming, or other activities affected by the Osage floods, and had observed them closely for fifty years. They had experienced the highest previous floods of 1895 and 1927. They had closely observed conditions on these streams in their natural [761] state for almost forty years before the dam was built and likewise noted the changes as they developed after 1931. As the Court said, in Hand v. Catawba Power Co., (S. C.) 73 S. E. 187 (where non expert witnesses testified to the cause of a channel filling above a dam). "It would have been

impossible for the witnesses to reproduce before the jury in detail the almost innumerable facts and circumstances which had occurred within their experience and observation, running through many years, and upon which their opinions were based." [See also St. Louis & S. F. R. Co. v. Bradley (C. C. A. 5th) 54 Fed. 630; Brown v. Bush, 45 Pa. St. 61.]. "A witness who cannot claim to be a skilled witness may nevertheless have a special experience which enables him to draw a more accurate inference from particular phenomena than could be drawn by a mere casual observer." [32 C. J. S. 94, Sec. 455.] Therefore, "it is well established that in relation to matters relevant to the issues of a case, when it is not possible or practicable to place before the jury all of the primary facts and circumstances in such way as to enable the jury to form an intelligent conclusion from them, witnesses who have had means of personal observation may state their opinions, conclusions, and impressions formed from such facts and circumstances as come under their observation." [20 Am. Jur. 640, Sec. 769; 32 C. J. S. 103, Sec. 461.] This rule may also apply to the cause of a particular occurrence relating to a matter with which a non expert witness is especially acquainted and which "cannot be fully reproduced and made intelligible to the jury except by an expression of an opinion in interpretation of the impression made on the mind of the witness." [20 Am. Jur. 688, Sec. 818; annotation L. R. A. 1915 A. 1053.] The basis of the opinion rule is that inferences and conclusions of unskilled witnesses are superfluous because they can be drawn by the jury as well as by the witness and, therefore, the witness should be required to give the jury the facts and data he has observed so that they may do so. [7 Wigmore 1, Sec.'s. 1917-1918.] However, when the witness cannot describe the data he has observed, so the jury will have it as fully and completely as does the witness, then the jury cannot be as adequately equipped as the witness to draw inferences from it. [7 Wigmore 22, Sec.'s. 1924-1926.] Thus the true test is: Does the jury need any inferences from the witness because his observed data cannot be adequately reproduced by him.

While these witnesses were not qualified to give opinions on hypothetical situations, they were properly allowed to summarize the effect of the situation they had seen develop. It was so held in Owen v. Chicago, R. I. & P. R. R., 109 Mo. App. 608, 83 S. W. 92, where "witnesses who had experienced floods at this point (where the railroad had obstructed the channel) at times when there were no obstructions . . . were allowed to state how much higher the obstructions caused the water to rise and how much longer it remained over the land." [See also Sullivan v. Union Electric Light & Power Co., 331 Mo. 1065, 56 S. W. (2d) 97; and Scanlon v. Kansas City, 325 Mo. 125, 28 S. W. (2d) 84, quoting and approving Greenleaf on

Evidence on the basis of the opinion rule.] What the testimony of these witnesses amounted to was that the changed conditions observed by them were sufficient to have a substantial effect upon the height of the water in the Fairfield area. The decisive question in this case is whether plaintiffs' evidence showed sufficient facts and circumstances in support of this view to amount to substantial evidence that these conditions caused the river to get enough higher, than it would have in its natural state, to overflow into plaintiffs' building; and, of course, the burden of proof on this issue was on plaintiffs. [Evans v. Massman Construction Co., 343 Mo. 632, 122 S. W. (2d) 924.] We hold that there was no error in the admission of this testimony.

■ Defendant argues that its dam was not of sufficient elevation to cause the 1943 flood to overflow plaintiffs' building; but plaintiffs do not contend that the dam was built high enough to back water into their building. Their claim is that conditions thereafter caused by the dam resulted in raising the level of the flood at the head of the lake. A similar case is McDaniel [762] v. Greenville-Carolina Power Co. (S. C.) 78 S. E. 980, where the defendant built a dam across a river, which plaintiff claimed "obstructed the natural flow of sand and water in the channel, causing the channel to fill with sand and mud, and thus causing the appellant's land lying above the dam to be overflowed." The court held that this claim stated a cause of action in trespass, although the dam was authorized by legislative authority, because even "if in the erection of the dam they exercised the highest degree of care, and were in no manner negligent, and conducted it in the most skillful manner, yet, if by the building and maintenance of the dam they injuriously affect their neighbors, they are liable in damages." The Court further said: "When the dam in question was erected, the waters from the pond in no manner affected appellant's land. She was at that time in no manner affected, and could not foresee that later she would suffer damage, and for that reason could not demand compensation for she then suffered no injury, and any claim made would have been conjectural and speculative on her part; but when she suffered injury from the erection and operation of the dam in question, then, and not until then, did a cause of action accrue to her." [See also Hand v. Catawba Power Co., (S. C.) 73 S. E. 187; United States v. Chicago, B. & Q. R. Co., 90 Fed. (2d) 161.] We think that the situation here is the same. Even if its flowage rights up to 673 feet were sufficient when the dam was originally built, defendant would be liable whenever conditions at the head of the lake, developing from the maintenance and operation of the dam and lake, caused a greater overflow there.

■ Defendant further claims that the cause of plaintiffs' damage was an act of God, an unprecedented rainfall so unusual that it could

not reasonably have been anticipated. Defendant points out that it was necessary for plaintiffs to prove that if there had been no dam their building would not have been flooded (the jury were so instructed); and says there was no evidence to show to what extent the silt deposits could have contributed to the height of the flood waters or to show what part of their damage was caused by the effect of the dam. None of plaintiffs' witnesses attempted to estimate how much higher these conditions caused the water to be than it would have been without them. Defendant, therefore, says that there was no substantial evidence that the dam was the proximate cause of plaintiffs' damage and that their evidence was so vague as to leave this wholly to speculation and conjecture. However, this fact, like any other, may be shown by circumstantial evidence. It is significant that, before the dam was built, there had never been an overflow high enough to even touch any part of plaintiffs' building. The height of the water so far above the highest previous floods must have been due either entirely to unprecedented rains or to the conditions created by defendant's dam and lake or to a combination of both, and we think that plaintiffs made a jury case at least on this latter theory.

Defendant, however, contends that in any event it is only liable for the amount of the damage caused by its acts. It argues that if part of the damage was due to conditions caused by its dam and part by an act of God, plaintiff must prove what proportion was caused by it to recover anything; citing Benson v. City of St. Louis (Mo. Sup.) 219 S. W. 575; William Tackaberry Co. v. Sioux City Service Co., 154 Ia. 358, 132 N. W. 945; and 56 Am. Jur. 522, Sec. 34. But we do not think the rule of these cases as to obstructions or pollution of streams, by persons not acting jointly, is applicable to the defense of "Act of God," under the facts of this case where no prior flood had ever reached plaintiffs' building.

It has been held that to give immunity it must appear that the act of God was not a proximate cause but was the sole cause. [56 Am. Jur. 521, Sec. 32 and cases cited.] Several Missouri cases have held that "if defendants' negligence concurred with the act of God and their negligence was one of the proximate causes of the damages, they would still be liable." [Bailey v. Wabash Ry. Co. (Mo. App.) 207 S. W. 82 [763] and cases cited; South Side Realty Co. v. St. Louis & S. F. R. Co., 154 Mo. App. 365, 134 S. W. 1034; Standley v. Atchison, T. & S. F. R. Co., 121 Mo. App. 537, 97 S. W. 244; Kenney v. Kansas City, P. & G. R. Co., 74 Mo. App. 301; see also Inland Power & Light Co. v. Grieger (C. C. A. 9th) 91 Fed. (2d) 811, 112 A. L. R. 1075 (which perhaps goes too far); Annotation 112 A. L. R. 1084; Annotation 169 A. L. R. 536.] However, we have more recently said: "It is true that many decisions speak of negligence concurring with an Act of God. . . . But as the terms vis major and Act of God

imply, the phenomenon must be irresistible, overpowering, and the effect unpreventable. When the result in part is ascribable to the participation of man, either through active intervention or neglect or failure to act, 'the whole occurrence is thereby humanized, as it were, and removed from the operation of the rules applicable to the acts of God.' Hence, when it is shown that in the exercise of due care, by way of anticipation or prevention, the casualty might have been averted by the defendant notwithstanding the abnormal event, that defense fails.'' [Whitaker v. Pitcairn, 351 Mo. 848, 174 S. W. (2d) 163.] As above noted, this case is not based on negligence but there is no good reason why the same rule should not apply to an intentional obstruction of a stream. Of course, all the authorities hold that if the rains were so unprecedented and overwhelming that they would have produced the flooding of plaintiffs' property regardless of the acts of defendant, then its acts could not be held to be a proximate cause of the damage.

The term ''Act of God'', in its legal sense, applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them. [Farnham 577A; Law v. Gulf States Steel Co. (Ala.) 156 So. 835.] Usually, however, whether a flood ''is such as should have been anticipated and provided against is a question for the jury.'' [44 Am. Jur. 473, Sec. 249; 2 Farnham, Waters, 1841, Sec. 577a.] We do not think it conclusively appears that the rains of May 1943 were so unprecedented that they could not have been anticipated. The average rainfall per day was not as great as in 1895, when the average of a four day·period was 1.54 inches per day, while in 1943 the average for a six day period was 1.19 inches per day. The total rainfall was as great in October 1941; but then the two flood periods were not so close together. Furthermore, the Pomme de Terre did not get as high, above the influence of the backwater from the Osage, in 1943 as it did in 1927; and there were no flood conditions on the Pomme de Terre, above the Osage flood, in 1943, after the first twenty-four hours. Moreover, the comparisons of the average rainfall in the Osage watershed for the various years were not on the same basis, being figured on an average of sixteen stations in 1895, twenty-two in 1927 and forty in 1943; and defendant's evidence as to the volume of flow of some of the earlier floods were based on estimates instead of measurements.

We think there was ample evidence of great enough deposits of silt to show a raising of the beds of the Osage and its tributary streams, in the upper part of the lake, so as to substantially affect their carrying capacity; and that this would raise the water level in these streams, retard the velocity of the water, and cause it to spread out and overflow. It must also be considered·that the head of de-

fendant's lake was above Fairfield on the Pomme de Terre and was also many miles above its mouth on the Osage; and that it was full to the level which extended it to these utmost points before the May 15-20 rainfall began; so that this flood water was held back and caused to pile up by the water already impounded by defendant's dam. It was necessary for the water to get four feet higher than it ever had, before it could get into plaintiffs' building. Since it got eight feet higher, it was only the last four feet of the flood level that caused plaintiffs' damage. We hold that the jury could reasonably infer from all the evidence as to these conditions, resulting from defendant's dam and lake, and their effect, that at least this much of [764] the excess over all previous floods was due to the silting and other conditions caused by the maintenance and operation of defendant's dam, and that plaintiffs' damage would not have occurred except for such conditions created by defendant.

The judgment is affirmed. *Tipton, Clark, Ellison* and *Douglas, JJ.,* and *Leedy, C. J.,* concur. *Conkling, J.,* dissents.

## On Motion for Rehearing.

HYDE, J.—In its motion for rehearing, defendant insists that even if the 1943 flooding of plaintiffs' building was not entirely due to an Act of God so as to preclude plaintiffs from recovering anything, nevertheless, plaintiffs must prove how much of their damage was caused by defendant's obstructioin of the stream; and that since plaintiffs did not do so it is at least entitled to a new trial.

Defendant says "if a natural force (whether anticipatable or not) contributed with the obstruction of the stream by a defendant to cause the overflow of the plaintiff's property, the damages are apportioned and the defendant is required to pay only that part of the damage attributable to his wrongful act."

It is true where part of flood damage would have been caused by an anticipatable overflow, without any obstruction, one who obstructed the stream would not be liable for such part but only for the additional damages caused by his obstruction, as the cases cited by defendant hold. [Sherwood v. St. Louis Southwestern Ry. Co. (Mo. App.) 187 S. W. 260; Brown v. C. B. & Q. R. Co., 195 Fed. 1007; Standley v. A. T. & S. F. R. Co., 121 Mo. App 537, 97 S. W. 244; McAdams v. Davis, 200 Ia. 204, 202 N. W. 515; Pfannebecker v. C. R. I. & P. R. Co., 226 N. W. 161.] However, in this case no anticipatable flood would have touched plaintiffs' building; none ever had been that high at this place. Therefore, if defendant's obstruction caused the excess, or only the last four feet of the excess, then defendant's act caused all the damage in this case. What we have held is that plaintiffs had substantial evidence to so show.

We pointed out that the instructions herein did apply the rule for which defendant contended, namely; that defendant was liable only if the jury found plaintiffs' property would not have been flooded except for defendant's dam. The jury was thus required to find that defendant's dam caused all of plaintiffs' damage; and this left no apportionment issue in the case.

The motion for rehearing is overruled. All concur.