SOMERSET VILLA, INC., Respondent,

v.

CITY OF LEE'S SUMMIT, Missouri, and Dacur Investment Company, Appellants.

No. 53479.

Supreme Court of Missouri,
Division No. 2.

Dec. 31, 1968.

As Modified on Court's Own Motion
Feb. 10, 1969.

Edgar S. Carroll, Thos. J., Conway, Kansas City, Richard K. Phelps, Lee's Summit, for respondent; Popham, Thompson, Popham, Trusty & Conway, Kansas City, of counsel.

Walter A. Raymond and Raymond, West & Strader, Kansas City, C. E. Lavery and Vera L. Jones, Lee's Summit, for appellant City of Lee's Summit.

Frank P. Sebree, William G. Zimmerman, Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, Joseph S. Levy, Bernard D. Craig, Bernard D. Craig, Jr., Levy & Craig, Kansas City, for appellant, Dacur Investment Co.

BARRETT, Commissioner.

Somerset Villa has been awarded $75,-000.00 damages for flood injuries on July 19, 1965, to its apartment house complex in Lee's Summit. The appellant-defendants are Dacur Investment Company, the builder-owner-operator of a 26-acre shopping center and Lee's Summit, a city of the fourth class. The area comprising the shopping center as well as the apartment complex area were once owned by J. A. McClendon who in 1957 sold the 26 acres to Central Leasing Company. On July 14, 1961 Central Leasing sold to Dacur Investment Company. This entire development lies southwesterly along Highway 50 and, as a matter of fact, was part of one or more farms McClendon purchased in 1946 and 1952. Before the sales to Dacur and Central Leasing, McClendon, in 1952, transferred part of the tract to Midwest Contracting Company, that company platted and developed its tract as a surburban housing development. Another part of the tract adjacent to and a part of the tract in which plaintiff's apartments are located was in 1954 transferred to, platted and developed by McClendon Development Company in which J. A. McClendon and his wife owned fifty percent of the capital stock. This latter area included that part of McClendon Drive, including the triple culverts involved in this litigation. McClendon and his wife, in 1955, had the twenty-six acre tract zoned for a shopping center. At McClendon's request Dacur built the street or road from the shopping center connecting with McClendon Drive. After securing engineering studies from an expert the plaintiff in 1963 started construction of its apartment house complex. The City of Lee's Summit annexed the area in question in 1955 and it was stipulated that the streets, drainage ditches and culverts were in existence at that time. McClendon testified that prior to 1965 there had been no flooding of the apartment complex area or over Highway 50. Mid-July 1965 was a rather heavy rainy season and on July 19, 1965, between the hours of 6:20 to 7:00 p. m., 1.55 inches of rain fell and in a very short space of time the plaintiff's apartment complex, principally ten or eleven basement apartments in the middle building, was flooded. The immediate cost of restoring the premises to normal operation was $24,696.-64.

In the plaintiff's petition, as against Lee's Summit, it is alleged that the city owned, maintained and controlled certain natural watercourses, streets, bridges and culverts, particularly a culvert or bridge at McClendon Drive and that in disregard of its duties and after notice and repeated requests permitted an excessive quantity of surface water to accumulate and on July 19, 1965, flood its apartments. It was charged that the tubes beneath the bridge had become clogged with dirt and debris so as to constitute a dam across the natural watercourse thus restricting the free flow of water. It was charged that "both above and below" McClendon Drive the city permitted weeds and debris to obstruct the drainage causing the banks of the natural watercourse to overflow into plaintiff's apartments. It was repeatedly charged that the city "negligently and carelessly" maintained the streets and culverts in the specified respects and finally caused and permitted the overflow and thereby committed a "trespass upon the property of the plaintiff." As to Dacur it

was charged that in connection with the maintenance and operation of its shopping center it "changed the natural course of the surface water and diverted said surface water towards the highway and into a ditch which made a sharp right-hand turn and which would not carry off water from rains" so that on July 19, 1965, the water "jumped McClendon Drive and poured into" plaintiff's apartments. It was charged that Dacur negligently installed certain "small culverts on a bridge which they constructed on their property" knowing that they were insufficient to drain the parking area of the shopping center. In this connection it was charged that Dacur permitted its changed watercourse and insufficient drains, tubes and bridge "to become fouled" with debris thus diminishing the flow of natural drainage. And it was said in this connection that Dacur "maintained a nuisance" and that as to "each of them * * * and because of the maintenance of the nuisance by both defendants and the committing of a trespass by both defendants" plaintiff suffered damage of $100,000.00.

Specifically, the plaintiff submitted the liability of Lee's Summit upon a finding that it "obstructed a natural watercourse downstream from plaintiff's property, and Second, such obstruction *directly caused or directly combined with the acts* of defendant Dacur" to cause plaintiff's damage. As to Dacur the plaintiff submitted its liability upon the hypothesis that Dacur constructed the shopping center bridge and culverts that "were too small and interfered with the free flowage of surface water and caused said water to collect and spill over onto plaintiff's property at or near said bridge in large and destructive quantities" and that its "conduct in so constructing said culverts was negligent" and that "such *negligence directly caused or directly combined with the acts of City of Lee's Summit*" to cause plaintiff's damage. The latter instruction contained a conventional definition of "negligence," and it should be noted in passing that these

instructions do not mention or define "nuisance."

Upon this appeal the appellants, particularly Dacur, contend that they are entitled to directed verdicts, not it should be noted because there is no evidence of negligence or nuisance as to either party defendant but, specifically, "because *plaintiff failed to produce any evidence concerning what portion of plaintiff's damage* (if any) *was caused by the alleged negligence of this defendant.*" This same point is made from several viewpoints: objections to instructions in not requiring the jury to find "that the negligence of this defendant, by itself, would have caused all of plaintiff's damage" and that instructions require an award of "the same damages against both defendants." Both appellants also assert that the maximum damages recoverable was the cost of repairs, $24,696.64. Both defendants claim as a matter of law that plaintiff assumed the risk and was guilty of contributory negligence as a matter of law. There are also claims of error in the admission and rejection of evidence, in the refusal of instructions and, in any event, of excessive verdict. Lee's Summit urges that there is no support for the hypothesis that it was under a duty to service and maintain the culverts because, it says, there was no proof of its acceptance of the dedicated streets in the platted areas. And finally the city contends that there was no submissible case against it because the drainage "moved through the apartment area in their natural channels unobstructed *except by drainage* structures built by plaintiff."

All these points are argued in great detail, supported by five sets of briefs, ten major points with numerous subpoints, but they have been rather summarily detailed because it is proposed to examine only so much of the cause as is necessary to a disposition of the appeal in this court. It is sufficient to say that the three-volume record and all ten assignments of error

have been thoroughly considered in reducing the appeal to its essence.

It is not necessary upon the basic issue of whether plaintiff made a submissible case to describe the 120 exhibits or detail the testimony of its nineteen witnesses. It is sufficient to say that plaintiff by eyewitness accounts of the flooding, by numerous descriptions of terrain, the physical properties and every conceivable corroborating circumstance as well as by the testimony of several experts, builders, engineers, developers, responding to hypothetical questions, made a submissible case as to liability of both defendant-appellants. According to McClendon and others the water from the shopping center first reached and flooded apartments, it "was jumping that 90-degree turn there," the "two tubes were completely stopped up," the water "jumped the road, sir, and come right down McClendon Drive." He said that the shopping center water was first: "There was water coming from the shopping center went over the wall, coming this way first." Then McClendon said the water from the shopping center, water from over Highway 50 and from the other flooded, inadequate culverts joined and inundated the apartments. Other witnesses examined, measured and described the deficiencies in the ditches, the tubes and all facilities connected with Dacur's property in great detail. Upon the assumptions of lengthy hypothetical questions, encompassing the essential circumstances it was the opinion of an expert, to illustrate, "with reasonable engineering (hydraulic) certainty," that "several factors" were the cause of the flooding "the main one being the three-culvert installation under McClendon Drive, * * * the two culverts at the upper left-hand corner of the drawing are inadequate, that is a contributing factor, but its not the great factor that the three culverts under McClendon Drive are. * * * That is the primary factor." And then as to the city as well as Dacur this particular expert said, "These three points, all three of them are contributing,

because the water doesn't take a general course, it jumps the bank, it will not stay within its own limits and gets out onto the street." And another expert engineer as to both Dacur and the city, after detailing his recommendations as to cleaning ditches and the 48-inch pipe said that the flood resulted from a combination of three factors. It was the opinion of another expert that Somerset's installations functioned properly and played no part in the flooding of its apartments. It was his opinion that the pipes under McClendon were inadequate and as a result "there was a rise in the water level behind or upstream, on the upstream side of it * * * and as a result the water backed in." He was of the opinion that water from the shopping center, since the area was closer, would flood the apartments "shortly after the rain started." He was of the definite opinion that changing the course of the ditch had quite an effect on the flooding. And these witnesses were of the opinion that the one and one-half inch rain that fell in a few minutes was far from catastrophic. From the approximately 794-acre drainage area the witnesses even calculated in cubic feet per second the amount and flow of the water through the various drainage facilities thus attributing to the 126 acres in the shopping area and the 26-acre shopping center and the city's facilities their proportionate contribution of floodwater.

On the other hand and in direct contradiction of the plaintiff's evidence the defendants Dacur and Lee's Summit offered evidence, lay and expert, that their facilities and those under their control were entirely adequate and proper and had nothing whatever to do with the flooding of plaintiff's apartments. For example, an engineer said that the "triple culverts" had no connection whatever with the flood. This and other experts were of the opinion that the plaintiff's installations, particularly "between the parking bridge and swimming pool," were the cause of the flooding of the apartments.

It was the opinion of one of these experts that "the fence and the culverts downstream produced what we call backwater curve" and produced the difficulty under McClendon Drive. Another of these experts was of the opinion that the water from the shopping center had passed under the culverts before the crest of the flood and that the real damage resulted from inadequate drains connected with Highway 50 and its embankments, the floodwater running over the highway and into the drainage area.

This is hardly an outline of all the circumstances adduced, it is sufficient to indicate, however, that plaintiff made a submissible case against both defendants and all fact issues were for the jury's resolution. Without indicating the court's opinion as to the precisely appropriate theory and without specific demonstration upon the record it is sufficient to briefly indicate the legal basis of plaintiff's theory and the defendant's liability as a jury question. As to Dacur the principles announced in these cases are controlling: Blackburn v. Gaydou, 241 Mo.App. 917, 245 S.W.2d 161; Standley v. Atchison, T. & S. F. Ry. Co., 121 Mo.App. 537, 97 S.W. 244 and Kennedy v. Union Electric Co., 358 Mo. 504, 216 S.W.2d 756. As to both defendants there are four possible theories of liability, (Corrington v. Kalicak, Mo.App. 319 S.W. 2d 888, 892) but it is not necessary to elaborate upon or distinguish them here. It may be noted, as applicable here, that in the latter case it was held that "There was insufficient evidence to declare as a matter of law that this flood was an act of God." Compare Sherwood v. St. Louis Southwestern Ry. Co., Mo.App., 187 S.W. 260. But as to the city and the maintenance of a nuisance as a theory of liability see Martinowsky v. City of Hannibal, 35 Mo.App. 70; Martin v. City of St. Joseph, 136 Mo.App. 316, 117 S.W. 94; Proper v. City of Independence, Mo.App., 328 S.W. 55. And in any event as to both defendants see Benson v. City of St. Louis, Mo., 219 S.W. 575 and Corrington v. Kalicak, supra. The plaintiff's evidence supports a finding, again a jury issue, that the injury to its apartment complex was permanent and that the mere cost of repairs did not compensate for the real loss and so recovery was not limited to repairs. Blackburn v. Gaydou, 241 Mo.App. 917, 245 S.W.2d 161; Shelley v. Ozark Pipe Line Corporation, 327 Mo. 238, 37 S.W.2d 518, 75 A.L.R. 1316. Compare Cirese v. Spitcaufsky, Mo.App., 265 S.W. 2d 753. Whether this will be true on retrial will depend upon the evidence introduced at that time. As the parties stipulated the allegedly offending streets, bridges and culverts together with their deficiencies were in existence when the city annexed the area and despite protests remained unchanged and so it was not necessary for the plaintiff to establish acceptance of a mere platted area to create liability, Rabbit v. City of St. Joseph, Mo.App., 186 S.W. 1131; Moseley v. Searcy, Mo., 363 S.W.2d 561. "The very act of municipal expansion followed by the implied invitation to the public to continue the use of the highway carried along the assumption of authority and its concomitant duties. These acts themselves converted the road into a city street and the duty of the county court to keep it in repair was immediately superseded by that of the city, and, for a negligent breach of this duty resulting in injury to one rightfully upon the street and acting with due care, the city must be held liable for the damages sustained thereby." Foster v. Kansas City, 114 Mo.App. 728, 732, 90 S.W. 751, 752; Martin v. City of St. Joseph, supra. It is not necessary to a disposition of this appeal to consider contributory negligence and assumption of risk as a defense, especially against a nuisance theory (Paddock v. Somes, 102 Mo. 226, 239, 14 S.W. 746, 749, 10 L.R.A. 254), upon this record these too, at best, were jury questions.

All this discussion, unfortunately, does not resolve the essentially meritorious question involved upon this appeal. Although the jury brought in one verdict ap-

portioning the damages, $50,000.00 to the city and $25,000.00 to Dacur, there is in accordance with the court's instructions a general verdict against both defendants for $75,000.00. In its Instruction 3, as stated, the city's liability was submitted upon the hypothesis of "obstructed a natural watercourse" which "directly caused or *directly combined* with the acts of defendant Dacur." In Instruction 4 in submitting Dacur's liability upon the small culverts negligently interfering with the flowage of surface water and that "such negligence directly caused or *directly combined* with the acts of City of Lee's Summit." In its brief the plaintiff points to Harrison v. Kansas City Electric Light Company, 195 Mo. 606, 93 S.W. 951, 7 L.R.A., N.S., 293, and says that the case "serves to illustrate the liability of a negligent tort-feasor when other causes, negligent or otherwise *contribute* to plaintiff's damage." (Emphasis supplied.) The plaintiff argues here that the injury "is a single one" and that the facts distinguish the flood and apportionment cases. And in Benson v. City of St. Louis, 219 S.W. 575, in a suit against a city and others it was said that "each acted independently of the other, but that each had knowledge of the acts of the other in the several encroachments * * * and * * * that each of said encroachments did contribute and would contribute to cause the overflow and damage." This case need not be analyzed in detail, reconciled or distinguished, the court did say that in the pollution of stream cases that "If damages are occasioned by independent acts, the tort-feasor is only liable for the damages that his act occasions, and must be sued separately." And in another flooding case, upon motion for rehearing, the statement is made that "where part of flood damage would have been caused by an anticipatable overflow, without any obstruction, one who obstructed the stream would not be liable for such part but only for the additional damages caused by his obstruction." Kennedy v. Union Electric Co., 358 Mo., l. c. 519, 216 S.W.2d l. c. 764. But in that case the jury was "required to find

that defendant's dam caused all of plaintiffs' damage; and this left no apportionment issue in the case." Other cases and annotations relating to this particular phase of the subject are Standley v. Atchison, T. & S. F. Ry. Co., 121 Mo.App. 537, 97 S.W. 244; annotations 112 A.L.R. 1084; 91 A.L.R. 759, "May acts of independent tort-feasors, each of which alone causes or tends to produce some damage, be combined to create a joint liability." In 1889 in Martinowsky v. City of Hannibal, a nuisance-pollution case, the court said, "So if several persons drain their premises in the same ditch, the waters from which are discharged near the premises of another, and produce an injury to his person or his comfortable enjoyment, each of the persons so using the drain is liable, *in separate actions* for the damage occasioned to him. * * * But in such a case the defendant is chargeable only to the extent of the injury done by himself. * * * When the act producing the injury is not joint, the party can be held responsible only to the extent of injuries inflicted by his own wrong, and a joint action against the parties, whose separate acts produced the wrong, cannot be brought." 35 Mo.App. l.c. 77. The plaintiff Somerset while asserting that the injury is single and permanent repeatedly says in its brief, as of necessity it must, that "*Defendant City is here charged with the maintenance of a nuisance and defendant Decur is charged with negligence.*"

■ But this again, significant as it is, does not quite reach and resolve the fundamental problem of this appeal and its disposition. The gist of the opinion thus far is that plaintiff has and its evidence supports a cause of action against both defendants. The problems suggested by Martinowsky v. City of Hannibal and perhaps Kennedy v. Union Electric Co., and the annotations have to do with the essential elements of liability and particularly with the ever-vexing problem of proximate cause. See Prosser, Torts, Sec. 41 "Causation In Fact." But as Prosser points out,

important as causation may be (here again a jury question), "It cannot be repeated too often that, while causation is essential to liability, it does not determine it. Other considerations * * * may prevent liability for results clearly caused." Prosser, Torts, p. 245.

And thus by a rather laborious process the crux of this appeal is reached. "Once it is determined that the defendant's conduct has been a cause of some damage suffered by the plaintiff, a further question may arise as to the portion of the total damage sustained which may properly be assigned to the defendant, as distinguished from other causes. The question is primarily not one of the fact of causation, but of the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes" (Prosser, p. 247–248), here "the maintenance of a nuisance and * * * with negligence" by separate defendants for separate acts and conduct even though it may be assumed that both are torts. And this is a novel question in this jurisdiction. In the stream pollution cases it was said, sixty years ago, that "one who contributes to the pollution of a stream is not answerable for the entire damages caused another, where the independent acts of others contribute to the pollution thereof, each being liable only for his own contribution to the injury." 24 L.R.A., N.S., 1185. The rationale of the pollution cases may not be too apropos, but as Prosser states the problem is one of "rough practical apportionment" which attempts to fairly limit "a defendant's liability to that part of the harm which he has in fact caused." Basically "(t)he distinction is one between injuries which are reasonably capable of being divided, and injuries which are not." There may be obvious difficulties of proof as to the apportionment of damages but "it is better to attempt some rough division than to hold one defendant for the wound inflicted by the other. Upon the same basis, if two defendants each pollute a stream with oil, it is possible to say that each has interfered to a separate extent with the plaintiff's rights in the water, and to make some division of the damages." Prosser, p. 248. Here, as stated, engineers purported to rather accurately compute the quantity and flowage of water from various sources through all the facilities involved, separating one drainage area from another. There are other relevant factors but it is sufficient here to further quote from and acknowledge the indebtedness to the text insofar as it is peculiarly applicable to this appeal: "Nuisance cases, in particular, have tended to result in apportionment of the damages, largely because the interference with the plaintiff's use of his land has tended to be severable in terms of quantity, percentage, or degree. Thus defendants who independently pollute the same stream, or who flood the plaintiff's land from separate sources, are liable only severally for the damages individually caused, and the same is true as to nuisances due to noise, or pollution of the air." Further excerpting from the text: "The same kind of apportionment is, however, entirely possible where some part of the damage may logically and conveniently be assigned to an innocent cause. Thus a defendant's dam or embankment might reasonably be expected to flood the plaintiff's property in the event of any ordinary rainfall, but a quite unprecedented and unforeseeable cloudburst may cause a flood similar in kind but far greater in extent. In such cases the weight of authority, notwithstanding the view of the Restatement of Torts to the contrary (Restatement, Torts, Sec. 450), holds that the defendant is liable only for such portion of the total damage as may properly be attributed to his negligence—or in other words, the flood which would have resulted from his obstruction with an ordinary rain." Prosser, Torts, p. 252–253. The text is quoted because of its aptness but the cases cited in the text are peculiarly applicable and precisely in point. Among others, Ryan Gulch Reservoir Co. v. Swartz, 77 Colo. 60, 234 P. 1059, and Boulger v. Northern Pac. Ry. Co., 41 N.D. 316, 171 N.W. 632 are quite

persuasive. And see the annotation 100 A.L.R.2d 16, "Apportionment of damages involving successive impacts by different motor vehicles" for a related matter.

■ For the reasons indicated, the consequence is that the verdict and judgment of $75.000.00 damages against both defendants as a joint and several liability may not be permitted to stand and the cause is reversed and remanded for a new trial in accordance with this opinion. In view of this disposition of the appeal it is not necessary to consider the numerous other assignments of error.

STOCKARD, C., not sitting.

PRITCHARD, C., concurs.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.