**Earl F. LANE, Appellant–Respondent,**

v.

**G & M STATUARY, INC., and Cincinnati Insurance Company, Respondents–Cross–Appellants.**

**Nos. 26242, 26244.**

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 28, 2005.

500

Randy Charles Alberhasky, Springfield, MO, for Appellant-Respondent.

David A. Childers, Springfield, MO, for Respondents-Cross-Appellants.

NANCY STEFFEN RAHMEYER, Judge.

Earl F. Lane ("Lane") claimed an injury from a lightning strike or lightning current while he was employed by G & M Statuary, Inc. ("G & M"). The Commission awarded permanent partial disability benefits, six weeks of temporary total disability and future medical care. Both parties appeal. We affirm.

Lane appeals the finding of permanent partial disability because he claims the award was inconsistent with the testimony that he requires further psychological care that potentially could change the extent of his permanent disability. Lane also finds error in the award of only six weeks tem- porary total disability because he main- tains that the evidence indicated that he was unable to work from four days after the accident through the date of the hear- ing, over three years later.[1]

G & M, on the other hand, challenges any award. In its first two points, G & M uses the defense that a lightning strike is an act of God and thus, not compensable unless Lane was able to show that he was at a greater risk to a lightning strike or electrical current than the general public. First, G & M contends there was no factu- al finding by the Commission that Lane's employment subjected him to a greater risk to lightning strike or electrical cur- rent, direct or indirect, than that to which the general public in the same vicinity would be exposed and, second, there was no substantial or competent evidence that Lane's employment subjected him to the necessary greater risk than the general public. G & M's third point is that sub- stantial evidence does not support the Commission's finding that an injury oc- curred at all to Lane from a lightning or electrical current.

For ease of discussion of the facts, we shall begin with G & M's claim that substantial evidence does not support Lane's claim that he was injured by light- ning or electrical current. The Commis- sion found that Lane met his burden of proving that a sudden, unexpected event occurred on June 10, 1999, which was a lightning strike or electrical current and which instantly struck Lane in the course and scope of employment.[2] When review-

---

1. The Commission found Lane was in off-work status after the incident for a total of nine weeks; however, G & M paid Lane ap- proximately three weeks temporary total dis- ability. The Commission allowed a credit for the benefits paid by G & M and awarded additional temporary total disability of ap- proximately five-and-a-half weeks.

2. The findings of the Administrative Law Judge included the following statement: "Claimant suffered a sudden unexpected event [on June 10, 1999,] which caused [him] to have an immediate and violent reaction and which caused [him] to exhibit symptoms of low back pain, depression and anxiety." The Commission supplemented the finding to

ing the Commission's factual findings, we determine whether the factual findings are supported by substantial evidence after considering all the evidence in the light most favorable to the Commission's award. *Smith v. Tiger Coaches, Inc.,* 73 S.W.3d 756, 761 (Mo.App. E.D.2002). The testimony supporting a finding that there was a lightning strike or electrical current which injured Lane during the course and scope of his employment, includes the testimony of Lane, Dennis Rantz ("Rantz"), Jason Burtless ("Burtless") and Steve Myers ("Myers").

Lane testified that he was holding a metal hoe and standing on a wet concrete floor, approximately two feet from an open doorway in a metal building. It was a common occurrence to have water on the ground because water was used as an ingredient to pour into the concrete mixer and also to wash the mixer off in the mid-afternoon. Lane testified that he did not see or hear the lightning strike, but felt a jolt before being thrown onto bags of concrete stacked against the wall behind him. He also testified that Rantz laughed and told Lane he "lit up like a Christmas tree" when the lightning struck him.

While Rantz admitted laughing at Lane, he testified that he only laughed because he thought the thunder had scared Lane and he further denied ever making a statement about Lane being hit by lightning or lighting up like a Christmas tree. Rantz testified that he was looking directly at Lane when the event occurred. There was a loud clap of thunder, then Rantz saw the metal hoe fly out of Lane's hands and a look of shock on Lane's face. Immediately after the incident, Lane appeared fright-

ened and sat on the concrete bags for several minutes. Lane's whole body shook as if he had the chills. Rantz denies that Lane was hit by lightning; however, following the incident, Rantz gave a report to his wife, Robyn, who writes the report for administration of workers' compensation claims for G & M, which indicated that Lane had been struck by lightning.[3]

Burtless, Lane's son-in-law and a seven-year G & M employee, testified that he saw both Lane and Rantz after the incident. He stated Rantz told him that he thought Lane had been hit by lightning and that Lane had a little blue aura surrounding him. Burtless testified that Lane looked very dazed. Likewise, immediately following the incident, Myers, another employee of G & M, testified that he had heard someone say that Lane was struck by lightning. Rantz admitted he could have been the one to state that Lane was struck by lightning, but not that he saw Lane hit by lightning.

After the incident, Lane rested for approximately twenty minutes, but refused any medical treatment and finished his shift. Lane reported to work and did "light duty" activities on the next day, but he began to feel stiff and sore after the following weekend. Lane could not get out of bed on Monday and complained about the symptoms that are the subject of the claim for permanent partial disability. The testimony of the events that occurred on and after June 10, 1999, supports a finding that Lane was injured by a sudden unexpected event, which was a lightning strike or electrical current, in the course

state that the sudden unexpected event "was a lightning strike or electrical current." We review the findings and award of the Commission and not those of the ALJ. *Seeley v. Anchor Fence Company,* 96 S.W.3d 809, 819 (Mo.App. S.D.2002).

**3.** Although Rantz claimed he always adds the word "supposed" to an accident report, "supposed" was not in the report detailing Lane's incident.

and scope of his employment. G & M's Point III is denied.[4]

■ We next turn to G & M's first two points that the award was caused by an act of God and is, therefore, not compensable. An act of God had been defined as an occurrence due to natural causes against which ordinary skill and foresight is not expected to provide. *Corrington v. Kalicak,* 319 S.W.2d 888, 892 (Mo.App. 1959). An injury or death caused by an act of God is not compensable in a workmen's compensation case unless it is shown that the character of the employment subjected the employee to hazards from the causative natural force greater than those to which the general public in the same vicinity is exposed. *Reich v. A. Reich & Sons Gardens, Inc.,* 485 S.W.2d 133, 135–36 (Mo.App.1972).

■ Even though lightning falls within the category of an act of God, in certain conditions it may be considered an accident arising out of and in the course of the employment as required by the Workers' Compensation Act. *Felden v. Horton & Coleman, Inc.,* 234 Mo.App. 421, 135 S.W.2d 1115, 1117 (1939). In order to assert an "Act of God" defense, the human actor must have exercised due care prior to the intervention of the super-human cause. *Arthur v. Royse,* 574 S.W.2d 22, 23 (Mo.App.1978). This defense is only available where the event is so extraordinary that " 'the history of climatic variations in the locality affords no reasonable warning of their coming' " and the event is not humanized by the participation of man. *McCutcheon v. Tri–County Group XV, Inc.,* 920 S.W.2d 627, 632 n. 2 (Mo.App.

S.D.1996) (quoting *Corrington v. Kalicak,* 319 S.W.2d at 892).

G & M relies upon the testimony of two experts to claim that it exercised due care prior to the intervention of the super-human cause and that Lane was not subjected to a risk greater than that to which the general public was subjected. Although the testimony of G & M's electrical contractor/engineer, Norman McIntosh ("McIntosh"), indicated the concrete mixer and building was properly grounded, the Commission was free to believe contrary evidence. McIntosh inspected the concrete mixer to insure that it was properly grounded, but his inspection only included a physical examination whereby he checked the wiring visually and tested all the electrical phases to ground and checked for a physical ground. He testified that a "[physical ground] is a separate ground wire pulled to bond the unit and the mixer and the controls and everything to the system ground back at the panel in the meter." It was stipulated that he did not examine any of the grounding system beyond the concrete mixer motor.

Furthermore, McIntosh admitted that he does not have any specialized training or formal education on how to ground a building for a lightning strike. He admitted that he did not know how to ground a building or object for a lightning strike and he did not know whether the wire and conduit used to ground the mixer was sufficient for lightning strikes. He did not know if the building was constructed with any grounding device in the ground, nor did he see any lightning attraction system on top of the building. He knew nothing about the properties of lightning except

4. In making that finding, we do not ignore G & M's argument that its doctor testified that Lane was not struck by lightning except to note that there was contrary testimony by Lane's witnesses, including his experts. This

Court defers to the Commission on issues of credibility and the weight to be given conflicting evidence. *Hughey v. Chrysler Corp.,* 34 S.W.3d 845, 846 (Mo.App. E.D.2000).

what he had seen on the "Discovery Channel and shows like that."

Chris Evans ("Evans"), an electrical engineer, inspected the G & M building and mixer on December 20, 1999. Evans testified that over the years he has had a considerable amount of experience with lightning and the protection of lightning strikes. Evans examined the mixer, including its motor connections, the external portion of the building, the meter installation where the main service comes into the building and the ground raceway. He observed the bonding jumpers internal to the metal portion of the building, which is an effective grounding system for the metal skin of the building. From these observations, Evans concluded that the building was wired in accordance with the National Electric Code and that the electric motor was also installed to meet the National Electric Code, using electric metal tubing running from the main distribution panel to the motor.

Evans testified that the inspection conducted by McIntosh revealed no electrical shorts or potential for electrocution in the motor to the mixer. His opinion that the building was grounded for lightning strikes was based upon his belief that there was an eight- to ten-foot ground rod attached to the copper wire that went into the ground below the power meter and control panel on the outside of the building; however, he also did not inspect or actually see the ground rod. Evans admitted that water increases hazards because it is such a good conductor. He refused to give any opinion on whether a damp or wet floor would have an effect on the ability to get shocked if lightning had struck the building. Evans agreed that small wooden, vinyl or metal sheds offer little or no protection from lightning and should be avoided during thunderstorms and that people should stay away from windows and doors as they can provide the path for a direct strike to enter a home. He agreed that one should not "lie on the concrete floor of a garage as it likely contains wire mesh," such as was contained in the floor of the G & M building.

■ The undisputed testimony indicates that Earl Lane was working as an assistant pourer, operating the mixer under the direction of supervisor Rantz in a metal building when the incident occurred. As noted, Lane was holding a metal hoe and standing on a wet concrete floor, which likely contained wire mesh, during a thunderstorm. There is evidence to support an inference that the injury occurred because Lane was standing on a wet floor in an improperly grounded workplace. When the result is in some part attributed to the participation of man, either through active intervention or neglect or failure to act, " 'the whole occurrence is thereby humanized, as it were, and removed from the operation of the rules applicable to the acts of God.' " *Arthur*, 574 S.W.2d at 24 (quoting *Kennedy v. Union Electric Co. of Missouri*, 358 Mo. 504, 216 S.W.2d 756, 763 (1948)). We find that substantial evidence supports the finding that Lane's injury was within the conditions in which a lightning strike may be considered an accident arising out of and in the course of employment as required by the Workers' Compensation Act. G & M's Points I and II are denied.

We shall now proceed to the points raised in Lane's appeal. Lane first argues that the Commission erred in making a finding that Lane had reached his maximum medical improvement and thus awarding permanent partial disability. Instead, Lane argues he should have been awarded temporary total disability until he reached his level of maximum medical improvement. Lane contends the award of permanent partial disability was inconsis-

tent with a finding of the need for future medical treatment.

As a result of the incident of June 10, 1999, the Commission awarded Lane ten percent permanent partial disability to the body as a whole. Two witnesses testified regarding the amount of a permanent partial disability. One witness testified that Lane had reached his maximum medical improvement. Dr. Belz, who testified on behalf of G & M, asserted Lane had a five percent disability of the body as a whole for his low back condition in the nature of a strain/sprain. The other witness, Dr. Halfaker, testified on behalf of Lane about Lane's psychological problems and claimed that Lane had not reached his maximum *psychological* improvement. Halfaker opined, if Lane received counseling with regard to his depression and anxiety conditions, he would suffer a five percent disability of the body as a whole. On the other hand, if Lane did not receive treatment for the psychological component of his injuries, Dr. Halfaker testified Lane's impairment could be as high as ten percent.

The Commission accepted the testimony of Dr. Halfaker and found Lane sustained injuries that would require future medical care in the form of psychological counseling and ordered G & M to provide the counseling as recommended by Dr. Halfaker. In essence, then, Lane argues that the Commission accepted the testimony of Dr. Halfaker regarding the need for future medical care, but did not accept Dr. Halfaker's opinion that Lane had not reached his maximum psychological improvement in order to award permanent partial disability. Lane contends he should have been awarded temporary total disability until he was able to return to work, his condition stabilized, or after psychological treatment ceased.

To the extent that Lane's point argues that a claim for future medical benefits and an award of permanent partial disability are inconsistent, the argument has no merit. A claim for future medical treatment is a component of the compensation due an injured worker under section 287.140.1. *Sullivan v. Masters Jackson Paving Co.*, 35 S.W.3d 879, 888 (Mo.App. S.D.2001). It is settled that the Workers' Compensation Act permits the allowance for the cost of future medical treatment in a permanent partial disability award. *Sharp v. New Mac Elec. Co–op.*, 92 S.W.3d 351, 354 (Mo.App. S.D.2003). This includes treatment that gives comfort or relieves even though restoration to soundness is beyond avail. *Landman v. Ice Cream Specialties, Inc.*, 107 S.W.3d 240, 249 (Mo. banc 2003). The Commission's finding that a claimant had reached maximum medical improvement is not inconsistent with a need for future medical treatment. *Id.*

To the extent that the point challenges the credibility findings of the Commission, we also find no merit. There was sufficient testimony to support a permanent partial disability award based on the testimony of Dr. Belz that Lane had reached his maximum medical improvement. There was evidence from which the Commission could have awarded five percent permanent partial disability; however, the Commission awarded ten percent permanent partial disability to Lane, which was based on Dr. Halfaker's assertion concerning the need for future counseling.[5] "The Commission is not bound by percentages of disability found by medical experts." *Hayes v. Compton Ridge Campground, Inc.*, 135 S.W.3d 465, 470 (Mo. App. S.D.2004). We find the Commission

---

5. G & M has not appealed the award of future medical care.

**506**

was free to believe the testimony of Dr. Halfaker regarding a ten percent permanent partial disability of the body as a whole without treatment, but the Commission was also free to believe that the psychological treatment was being provided as relief or comfort to Lane instead of as a cure for Lane's physical condition. This court defers to the Commission on the issues of credibility and the weight to be given conflicting evidence. *Hughey v. Chrysler Corp.*, 34 S.W.3d 845, 846 (Mo. App. E.D.2000). We will not substitute our judgment on the weight of the evidence or on the credibility of the witnesses for that of the Commission. We find that substantial evidence exists to support the Commission's determination that Lane had reached his maximum medical improvement even though he was awarded future medical care. Lane's first point is denied.

 Finally, we turn to Lane's contention that an award of only six weeks temporary total disability was error. "The burden of proving entitlement to temporary, total disability benefits [is] on [the][e]mployee." *Seeley v. Anchor Fence Company,* 96 S.W.3d 809, 821 (Mo.App. S.D.2002). Temporary total disability compensation is paid until the employee can return to work, his condition stabilizes, or he has reached a point where further progress is not expected. *Minnick v. South Metro Fire Protection Dist.,* 926 S.W.2d 906, 909 (Mo.App. W.D.1996). The purpose of temporary, total disability benefits is to cover the cost for a worker's healing period. *Seeley,* 96 S.W.3d at 821. The test is whether an employee is able to compete in the open labor market given the employee's present physical condition. *Cooper v. Medical Center of Independence,* 955 S.W.2d 570, 575 (Mo.App. W.D.1997).

Lane contends there was substantial and credible evidence, in the form of medical opinions, that he was unable to work from the time he was first seen in August of 1999 through September of 2001. He argues that the only contrary evidence came from Dr. Belz, who was of the opinion that Lane did not suffer from any lightning strike injury. Lane cites to cases which find the testimony of the claimant alone is sufficient evidence to support an award for temporary total disability and then points to his own testimony regarding his incapacity to work. He also cites to one of his doctor's opinions finding that on June 6, 2001, Lane was not capable of working and was not likely to improve substantially so as to return to work because of his emotional and cognitive problems.

 It is true that there was sufficient evidence in the record to support Lane's allegations that his life took a dramatic turn for the worse after the incident and would have supported a longer award of temporary total disability had the Commission chosen to do so; however, that is not the posture of the case before us. We do not decide cases in the first instance; "[w]e must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222–23 (Mo. banc 2003). "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record [and] an award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id.* at 223.

As noted above, Dr. Belz provided a medical opinion that Lane was not totally disabled on October 1, 1999, the date of Lane's first visit to Dr. Belz. Additionally, the medical testimony of Dr. Cornelison indicates that Lane was placed in off-work

status on July 29, 1999, for two additional weeks from that date. The Commission used Dr. Cornelison's medical records to calculate the total of nine weeks that Lane was unable to return to work. In light of the findings of the Commission that Lane is permanently and *partially* disabled,[6] we cannot disturb the inference that Lane's condition had stabilized and he was able to return to employment nine weeks after the incident. We find no error in the award of temporary total disability. Lane's second point is denied.

The judgment is affirmed.

GARRISON, P.J., and PREWITT, J., concur.

---

6. Lane did not provide evidence that he was permanently and totally disabled.